UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM H. MCESSY

                               *Plaintiff,*

               -against-

GREGORY W. GRAY, JR.; GREGORY P. EDWARDS;
ARCHIPEL CAPITAL, LLC; BIM MANAGEMENT, LP;
BENNINGTON INVESTMENT MANAGEMENT, INC.;
NIXON PEABODY, LLP; JOHN KOEPPEL ESQ.; and
against all in a representative and fiduciary capacity as
acting GENERAL PARTNERS and CONTROL
MEMBERS of BENNINGTON —EVERLOOP, LP,;
ARCHIPEL CAPITAL–AGRIVIDA, LLC; ARCHIPEL
CAPITAL –BLOOM ENERGY LP; ARCHIPEL CAPITAL
- LATE STAGE FUND, LP; ARCHIPEL CAPITAL —
LINEAGEN, LP; ARCHIPEL CAPITAL –  SOCIAL
MEDIA FUND, LP (1, 2, 3 & 4) and against each of said
funds Individually as Limited Partnership Enterprises and as
Attorneys and Publishers of all Private Placement
Memorandums in connection with each/any/or all of the
above entities; and against MV LIQUIDITY FUND, LLC;
MV LIQUIDITY FUND I, LLC; MICROVENTURE
MARKETPLACE, INC.; and Jane Does and Mary Roes
(#1-10)

                         *Defendants*        .
_____

**COMPLAINT**

Civil Case No.:
      1:15-CV-1462 (LEK/ATB)

JURY TRIAL
DEMANDED

## SUMMARY OF ALLEGATIONS

    1.    This lawsuit is a federal securities action, with related state law claims, brought

on behalf of the plaintiff, William H. McEssy, against Defendants GREGORY W. GRAY,

individually, GREGORY P. EDWARDS, individually, ARCHIPEL CAPITAL, LLC, BIM

MANAGEMENT, LP, BENNINGTON INVESTMENT MANAGEMENT, INC., JOHN

KOEPPEL, ESQ., NIXON PEOBODY, LLP, MV LIQUIDITY FUND, LLC; MV LIQUIDITY FUND I, LLC, MICROVENTURE MARKETPLACE, INC., and each of the above named ARCHIPEL entities (funds) controlled by GRAY, EDWARDS, ARCHIPEL, BENNINGTON, BIM and others, to recover losses sustained as a result of the unlawful conduct and fraudulent Ponzi-like scheme perpetrated by Defendants for the purpose of defrauding the Plaintiff as an investor in the various Archipel/BIM-managed investment funds (referred to herein at various times as the "Archipel Entities" or "Funds").

2.      From 2011 to the present, GRAY, EDWARDS, ARCHIPEL CAPITAL, LLC, the various ARCHIPEL Entities (funds), BIM, and NIXON PEABODY, in concert with one another and together, by certain officers and/or employees of the respective companies, have raised nearly $20 million from at least 140 investors throughout the United States and abroad.  While each of the ARCHIPEL Entities has been set up to have its own bank account, from at least September 2011 GRAY, EDWARDS and the companies they control, have commingled and transferred funds among the ARCHIPEL Entities as they wished, funding one ARCHIPEL Entity's investment in a portfolio company with funds transferred from other ARCHIPEL Entities.

3.      From at least May of 2011, GRAY, EDWARDS, ARCHIPEL, BIM, BENNINGTON INVESTMENT MANAGEMENT, INC. ("BENNINGTON"), and other companies owned and controlled by these individuals and entities, together with the help, assistance, and legal expertise of NIXON-PEABODY, LLP, by and through that law firm's agents, officers and/or employees, raised money from investors by making wholesale misrepresentations of material facts, all designed in a way to prevent the investors they pitched from knowing the real truth about the investments they were seeking money for, and

to hide from investors the fact that GRAY had been sanctioned by FINRA, and the New York Stock Exchange, to the point where he was forced to give up his license and leave the brokerage world of finance.  The Defendants withheld from the investors significant facts and circumstances of GRAY'S past dealings, his fraudulent churning and misuse of customer money, and his serial threats that he made to investors when they dared to question his motives and activities.  Together and in concert, the Defendants collaborated together in such a fashion so as to prepare, print and deliver Private Placement Memoranda ("PPMs") and other marketing materials that were false, fraudulent, and purposely designed to prevent potential investors from knowing about the true facts and circumstances of GRAY's background, and fraudulently held out GRAY to the public at large as an investment expert, and a registered wealth advisor, when each of the factual statements were false and fraudulent, and designed only to give investors the belief that GRAY was an expert in his field, with a stellar background in equity finance.

4.     Upon information and belief, and before May of 2011, GRAY had disclosed to NIXON-PEABODY, LLP, and specifically John Koeppel, a partner of that Firm, that GRAY had been the subject of severe discipline while working with brokerage firms, in that he misused his customers' money without their knowledge and consent, and when confronted by the client for his misdeeds, threatened to kill the customer, and do other bodily harm to them if they continued to go forward with their complaints.  As a result of these activities, GRAY was censured and barred from selling to the public for a period of three (3) years.  In February of 2008, he surrendered his license for trading.  To date, he has not recovered his license.

5.     However, this information was not placed into the PPMs that were generated

by and sponsored by GRAY, EDWARDS, BIM, BENNINGTON and NIXON-PEABODY, LLP.  The Defendants and their lawyer and law firm decided to keep this information private, and not share this information with the potential investors who were being given the PPMs by GRAY, EDWARDS, BIM, BENNINGTON, and NIXON-PEABODY, LLP.  In addition to this failure to share necessary information, either as a biographical statement or as a risk factor in the PPMs, the Defendants, and each of them, jointly, severally, and in concert with one another, drafted a biographical presentation for GRAY that was filled with misstatements and falsities, including the fact that he was a registered wealth advisor.  These representations and the failure to provide the negative disciplinary action against GRAY, were such that the Defendants violated applicable securities laws and regulations, and otherwise that the Defendants sought to raise money for the ARCHIPEL enterprises in a false and fraudulent manner, both through the PPMs and through other fraudulent statements and claims made with respect to the various entities formed by GRAY and EDWARDS, together with BIM, BENNINGTON, NIXON-PEABODY, LLP and JOHN KOEPPEL, ESQ.

6.      In addition, from at least June 2014 through early March 2015, GRAY, as partner, managing director, and control member of Archipel Capital, LLC, BIM, and BENNINGTON, operated a Ponzi-like scheme whereby GRAY, in concert with EDWARDS, presented an investment opportunity to the Plaintiff, stating that Archipel had been given an allocation of $5,000,000.00 worth of Uber stock, and then falsely, fraudulently and for the purpose of inducing the Plaintiff to invest, represented to the Plaintiff, both orally and in written offering documents, that if he invested $5,000,000.00 in Archipel Capital-Late Stage Fund, LP, then they would use that money to purchase the entire $5,000,000.00 allocation of Uber shares for the Plaintiff.

7.     After inducing Plaintiff McEssy to invest in ARCHIPEL CAPITAL-LATE STAGE FUND, LP, GRAY took McEssy's entire $5,000,000.00 investment, and approximately $300,000.00 from two other Archipel Entity funds, and used the money to provide fictitious returns to, among others, MV LIQUIDITY FUND I, LLC, an investor in another Archipel Entity; ARCHIPEL CAPITAL - SOCIAL MEDIA FUND, LP ("Social Media Fund"), in connection with MV LIQUIDITY FUND I, LLC's investment in that fund.

8.     Upon information and belief, and as explained in further detail below, this scheme to defraud was perpetrated by the Defendants in order to make up a shortfall in shares and cash resulting from Gray's failure to purchase the pre-IPO shares of Twitter as promised to Social Media Fund investors.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367; Sections 20(b), 20(d) and 22(a) of the Securities Act (15 U.S.C. §§ 77t(b), 77t(d), 77v(a)]; and Section 27 of the Securities and Exchange Act of 1934 [15 U.S.C. § 78aa].

10.     Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2); Section 22(a) of the Securities Act [15 U.S.C. § 77v (a)]; and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, and/or some or all of the Defendants transact or transacted business within the Northern District of New York, including but not limited to NIXON PEABODY, LLP, who has an office for the transaction of business located within the Northern District of New York.  In addition, this case is related to, arises out of the same nucleus of facts, and involves virtually identical defendants as another case currently pending in the Northern District of New York, specifically *Andrew Goldberg v.*

*Gregory W. Gray, Jr., et al.* (Case No.: 5:15-CV-538), and many of the events constituting or giving rise to the alleged violations occurred in the Northern District of New York, including the dissemination of false statements and omissions in offering documents by the Defendants and in-person meetings with prospective investors in Archipel/BIM managed limited partnerships taking place in the Northern District of New York.

11.    In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instruments of transmission or communications in, and throughout the United States, and the means or instrumentalities of interstate commerce, the mails, express trucking, airplane and delivery services, all of which inform and are applicable to the use of Interstate Commerce, where the lies, misrepresentations and other falsities were transmitted solely for the purpose of obtaining investor money for the sole and unencumbered use of the Defendants herein.

## THE PARTIES

12.    PLAINTIFF WILLIAM H. MCESSY is a resident of the State of Illinois who lost $5,000,000.00 in principal investment as a result of the unlawful, fraudulent conduct of the Defendants with regard to their Archipel/BIM managed investment funds, including but not limited to Archipel Capital-Social Media Fund, LP and Archipel Capital-Late Stage Fund, LP.

13.    GREGORY W. GRAY, Jr., age 39, resides in Buffalo, New York and has a principal place of business for his ARCHIPEL Companies located at 1716 Main Street, Suite 100 Buffalo, New York, 14209.  GRAY has additional residences in Chicago, Illinois, and Lake Worth, Florida.

14.    Upon information and belief, GRAY co-founded ARCHIPEL CAPITAL, LLC in 2005, along with Defendant GREGORY P. EDWARDS, and is and has been the

6

company's Managing Partner. GRAY is also one of two general partners of BIM MANAGEMENT LP, the other general partner being EDWARDS.

15.    Upon information and belief, Defendant GREGORY P. EDWARDS is a resident of the City of Toronto, Province of Ontario, and Country of Canada.  At all times relevant herein, Defendant EDWARDS resided at 12 Moorehill Drive, Toronto, ON M4G 1A1, Canada.

16.    Upon information and belief, at all times relevant herein, Defendant EDWARDS was Chairman of the Board of ARCHIPEL CAPITAL, LLC, and each and every one of the ARCHIPEL companies.  As such, Edwards was a control person of ARCHIPEL CAPITAL, LLC and its members, including Defendant GRAY, as well as a control person of each and every ARCHIPEL entity (fund).  Also, EDWARDS was a member of the Board of Directors of EVERLOOP, LP.

17.    Additionally, EDWARDS was a general partner and manager of BIM Management, LP, and was a control person of that entity.  He additionally was the sole owner of BENNINGTON INVESTMENT MANAGEMENT, INC., a Canadian Corporation that was doing business within the State of New York, and partner of BIM.

18.    Upon information and belief, Defendant GRAY was an advisor to BENNINGTON INVESTMENT MANAGEMENT, INC.

19.    In December 2008, GRAY was censured and barred for three years from association with NYSE member firms based on findings that he had (a) engaged in unauthorized trades in several of his customers' accounts and (b) threatened and/or harassed complaining customers and/or their family members, some with the threat of death. This bar was upheld by the New York Stock Exchange Appeals Commission on July 22, 2009 *(In the*

*Matter of Gregory W Gray,* Jr., Rel. No. 60361 (July 22, 2009)).   GRAY surrendered his license in February of 2008.

20.       ARCHIPEL CAPITAL, LLC is a New York limited liability company, founded in 2005 and incorporated on May 15, 2006, with its principal place of business located at 1716 Main Street, Suite 100, Buffalo, NY.

21.       Upon information and belief, GRAY is and at all times herein mentioned was the owner of 65.1% of ARCHIPEL'S membership interests. ARCHIPEL'S other membership interests are owned by two of GRAY's business associates, GREGORY P. EDWARDS (25%) and ANTHONY ORAM (9.9%).   ARCHIPEL has no assets or employees, but is used by GRAY, EDWARDS and ORAM primarily as a "brand."

22.       BIM is a Delaware limited partnership incorporated on May 10, 2011, with its principal place of business located at 1716 Main Street, Suite 100, Buffalo, N Y.  BIM is owned by ARCHIPEL and a Toronto, Ontario based entity, BENNINGTON INVESTMENT MANAGEMNT, INC. ("BENNINGTON"), which is entirely owned by EDWARDS and operated by EDWARDS and GRAY.  Like ARCHIPEL, BIM is owned by GRAY, and his two business associates, in the same percentages as the ownership of ARCHIPEL. BENNINGTON is owned 100% by EDWARDS.

23.       BIM is the General Partner or Managing Member of each of the ARCHIPEL Entities, and GRAY directs and has directed BIM's investment and operational activities, in conjunction with EDWARDS, who GRAY calls the "Godfather". Although BIM was entitled to take a 5% up-front management fee on each new investment into the ARCHIPEL Entities, in practice, GRAY simply helped himself to the ARCHIPEL Entities' bank accounts whenever he wanted to, many times in excess of the 5% management fee.

24.     Upon information and belief, ARCHIPEL-AGRIVIDA, LLC ("AGRIVIDA, LLC") is a Delaware limited liability corporation incorporated on or about July 28, 2011, with its principal place of business in Buffalo, NY. The LLC was organized by GRAY and the other Defendants with the purpose of acquiring Series B+ Preferred Stock of Agrivida, Inc. BIM is the Managing Member of AGRIVIDA LLC. Since its inception, AGRIVIDA, LLC raised $385,000.00 from 13 investors.

25.     Upon information and belief, ARCHIPEL CAPITAL—BLOOM ENERGY, LP (BLOOM LP") is a Delaware limited partnership incorporated on February 24, 2012, with its principal place of business at the ARCHIPEL offices in Buffalo, NY.  BLOOM, LP was formed by GRAY with the purpose of acquiring common stock and capital stock of Bloom Energy Corp.  BIM is the General Partner of BLOOM, LP.  Since its inception, Bloom Energy LP has raised $3,160,566.25 from 32 investors.  Upon information and belief, an investor residing in China has agreed to invest $470,000 in Bloom Energy LP in recent weeks.

26.     ARCHIPEL CAPITAL—LATE STAGE FUND, LP ("LATE STAGE FUND, LP") is a Delaware limited partnership incorporated on May 9, 2014, with its principal place of business at the ARCHIPEL offices in Buffalo, NY.  According to the Defendants, the purpose of the LATE STAGE FUND, LP is to acquire shares in a portfolio of companies, largely venture-capital- backed, late-stage companies, and with pre-IPO shares of Uber being the partnership's primary intended holding.  Upon information and belief, BIM is the General Partner of LATE STAGE FUND, LP. Since its inception, LATE STAGE FUND, LP has raised $6,020,640.00 from nine investors.

27.     Upon information and belief, ARCHIPEL CAPITAL—LINEAGEN, L P

("LINEAGEN, LP") is a Delaware limited partnership formed and filed on or about February 24, 2012, and has its principal place of business located at the ARCHIPEL offices in Buffalo, NY.  The stated purpose of LINEAGEN, LP is to acquire Series B and Series C Convertible Preferred Stock of LINEAGEN, Inc. BIM is the General Partner of LINEAGEN LP. Since its inception, LINEAGEN, LP has raised $1,888,876.91 from 28 investors.

28.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND,  LP ("SOCIAL MEDIA FUND LP") is a Delaware limited partnership formed and filed on or about May 17, 2012, with a principal place of business located at the ARCHIPEL offices in Buffalo, New York. The stated purpose of SOCIAL MEDIA FUND, LP is to invest in portfolio companies in the social media industry, in particular Twitter.  BIM is the General Partner of the SOCIAL MEDIA FUND, LP.  Since its inception, SOCIAL MEDIA FUND, LP has raised $2,396,618.99 from 46 investors.

29.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND II, LP ("SOCIAL MEDIA FUND II, LP") is a Delaware limited partnership formed and filed on or about September 11, 2013, with its principal place of business located at the ARCHIPEL offices in Buffalo, NY with the purpose of investing in portfolio companies in the social media industry, in particular Twitter. BIM is the General Partner of SOCIAL MEDIA FUND II, LP. Since its inception, SOCIAL MEDIA FUND II, LP has raised $1,268,473.50 from one investor, Defendant MV LIQUIDITY FUND I, LLC.

30.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND 3, LP ("SOCIAL MEDIA FUND 3, LP") is a Delaware limited partnership formed and filed on or about March 20, 2014, with its principal place of business is located in the ARCHIPEL offices in Buffalo, NY, and

formed for the purpose of investing in portfolio companies in the social media industry, in particular Twitter.  BIM is the General Partner of SOCIAL MEDIA FUND 3 LP. Since its inception, SOCIAL MEDIA FUND 3, LP has raised $1, 300,000.00 from two investors, including $1,200,000.00 from Plaintiff McEssy.

31.    ARCHIPEL CAPITAL – SOCIAL MEDIA FUND 4, LP ("SOCIAL MEDIA FUND 4, LP ") is a Delaware limited partnership formed and filed on or about March 20, 2014, with its principal place of business in Buffalo, NY, with the purpose of investing in portfolio companies in the social media industry, in particular Twitter.  BIM is the general partner of SOCIAL MEDIA FUND 4, LP and has raised to date $275,000 from three investors.  For purposes of this complaint, all of the Social Media Funds will be referred to collectively as the "SOCIAL MEDIA FUND, LP", as the four entities did not have separate offering documents and shared one bank account.

32.    Upon information and belief, GRAY founded Defendant ARCHIPEL CAPITAL, LLC in 2005.  ARCHIPEL is "branded" by GRAY and EDWARDS as a venture capital company. GRAY is the Senior Managing Director. EDWARDS is the Chairman of the ARCHIPEL board.

33.    Upon information and belief, and in the Spring of 2011, GRAY began to solicit investments from individual investors and small investment entities promising interests in the ARCHIPEL entities (funds) that the Defendants had formed to that date and were to form in the future.

34.    Once the investor money was delivered, the model called for GRAY to invest the investor money into a private company or companies that GRAY and the ARCHIPEL Defendants believed would soon realize a "liquidity event" (*i.*e. an initial public offering or merger or acquisition).

11

35.     Upon information and belief, from 2011 to the present, GRAY and the Defendants have raised approximately $19.6 million in investments from at least 140 individuals and investors for at least six (6) offerings of the ARCHIPEL Entities.

36.     Upon information and belief, the amounts raised for each of the ARCHIPEL Entities are set forth as follows:

| Offering | Purported Investment | Dates Funds Were Raised | Amount Offered | Amount Raised | Number of Investors |
|---|---|---|---|---|---|
| Bennington – Everloop LP | Everloop, Inc. | 4/2011 to 10/2012 | $5.5 million, up to $10 million | $2,913,131.19 | 68 |
| Archipel Capital – Agrivida LLC | Agrivida. Inc. | 7/2011 to | $7.5 million | $385,000.00 | 13 |
| Archipel Capital – Bloom Energy LP | Bloom Energy Corp. | 3/2012 to | $5 million | $3,160,566.25 | 32 |
| Archipel Capital – Social Media Fund LP | Twitter_ Inc. and "portfolio companies in the social media industry" | 6/2012 to 11/2013 | $5.5 million | $5,240,092.49 | 51 |
|  |  |  | $7 million | $1,888,876.91 | 28 |
|  |  | 3/2014 to present |  |  |  |
| Archipel Capital – Late Stage Fund | Uber Technologies, Inc. and "a portfolio of companies, with the majority of them being venture capital backed, late stage companies" | 6/2014 to present | $15 million | $6,020,640.00 | 9 |

37.     BENNINGTON–EVERLOOP, LP ("BELP"), is a Delaware limited partnership having its principal place of business in Buffalo, New York, and formed in May of 2011 for the purpose of investing in EVERLOOP, INC.  At all pertinent times herein EVERLOOP and BELP were doing business within the State of California.

38.     Defendant JOHN KOEPPEL, ESQ. is a partner in the national law firm of NIXON PEABODY, LLP, counsel to ARCHIPEL CAPITAL, LLC, BIM, and the

ARCHIPEL ENTITY funds, having his principal office for conducting business in Buffalo, New York, and also transacting business through Nixon Peabody's offices located in Rochester and Albany, New York.

39.     Defendant NIXON PEABODY, LLP is a national law firm having offices throughout the United States, including offices in Buffalo, Rochester, Albany, and New York, New York.

40.     MV LIQUIDITY FUND, LLC is a limited liability company formed and existing under the laws of the State of Delaware, having a principal place of business at 12513 Uvalde Creek Drive, Austin, Texas 78732.

41.     MV LIQUIDITY FUND I, LLC is a limited liability company formed and existing under the laws of the State of Delaware, having a principal place of business located at 12513 Uvalde Creek Drive, Austin, Texas 78732.

42.     MICROVENTURE MARKETPLACE, INC., is a corporation formed and existing under the laws of the State of Delaware and having its principal place of business located at 2905 San Gabriel Street, Suite 212, Austin, Texas 78705.   MicroVenture Marketplace is a registered Broker/Dealer and member FINRA/SIPC, and is the parent company, sponsor and/or successor in interest of MV Liquidity Fund, LLC and MV Liquidity Fund I, LLC.

## FACTUAL BACKGROUND

43.     At least as early as September 2011, when GRAY transferred $50,000 from AGRIVIDA, LLC to BELP, GRAY has commingled and transferred money between the various ARCHIPEL funds ("Archipel Entities").

44.     GRAY and NIXON set up each ARCHIPEL Entity in roughly the same way.

Investors bought interests in a limited partnership or limited liability company that supposedly invested the pooled funds entirely or primarily into a specific company or companies.  BIM was the Managing Member or General Partner of each, with broad investment and operational discretion.  GRAY is listed in the PPMs for the ARCHIPEL Entities as the contact for BIM, on occasion with EDWARDS.  GRAY, on behalf of BIM, signed all, or substantially all of the subscription agreements. GRAY opened separate bank accounts and brokerage accounts for each ARCHIPEL Entity, and has signatory authority on each bank account and trading authorization over each Entity's brokerage account.  EDWARDS has signatory authority on five of the bank accounts—including two with nearly all of the ARCHIPEL Entities' current liquid assets.

45.     Under the subscription agreements for each of the ARCHIPEL Entities, BIM is given the power to "carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may in its reasonable and good faith discretion deem necessary or advisable or incidental thereto." The PPMs for the ARCHIPEL Entities' offerings provide that BIM will "provide various advisory and management services to the Partnership," including "negotiating" and "structuring the Partnership's investment," "evaluating and monitoring the Partnership's investment," "monitoring the industry in which" the companies operate," and "providing periodic reports to Partnership investors" on the investments.

46.     BIM has the power for SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP to choose the identity of the portfolio companies themselves, as well as the "sole discretion" to "determine to make distributions, whether cash, in kind, or a combination thereof, even if such securities have been registered for resale under the 1933 Act."

14

47.    In exchange for its management and investment advisory services, the PPMs provide that BIM will be compensated with a management fee of 5% (paid up-front) of the total capital raised by each ARCHIPEL Entity, as well as a performance-based payment of 10% carried interest on the partnerships' profits. BIM also has the right to reserve investor money for expenses not anticipated to exceed 2.5% for AGRIVIDA LLC) and 5% (for the other ARCHIPEL Entities) of total capital raised.

48.    To date, Twitter is the only portfolio company that has undergone a positive liquidity event (having gone public in November 2013).  SOCIAL MEDIA FUND, LP, which invested solely in Twitter shares, is the only ARCHIPEL Entity that has given investors a positive return on their investment.  BLOOM ENERGY, LP and LATE STAGE FUND, LP are open for investment and may accept additional investors.  LINEAGEN LP and AGRIVIDA LLC are no longer accepting investors. Neither Lineagen Inc. nor Agrivida, Inc. has yet undergone a liquidity event so no investors have been redeemed.

49.    Everloop, Inc. collapsed and Bennington-Everloop, LP ("BELP") received funds from a settlement with Everloop, but it is not now accepting new investor money.  However, the settlement money has not been fully and appropriately accounted for or distributed among the BELP investors.

50.    In or around May 2012, GRAY began to solicit investors for SOCIAL MEDIA FUND, LP.  Social Media Fund LP issued a PPM describing its purpose as "raising capital, to target investments in portfolio companies in the social media industry with "the first of its investments" to be pre-IPO common stock of Twitter "at a price not to exceed $26.00 per share."

51.    In September 2012, SOCIAL MEDIA FUND, LP agreed to purchase 25,000 Twitter shares for $25.50 per share, for a total of $637,500.  In addition to this, there was

$15,000.00 in fees charged to the investors by BIM.

52.     By this point, although GRAY had raised enough investor money in the fund to cover this purchase, he had transferred more than half out of the partnership's bank account and into the accounts of other Archipel Entity funds that were managed and controlled by GRAY and EDWARDS.  For example, on June 27, 2012, GRAY transferred $150,000 from SOCIAL MEDIA FUND, LP to AGRIVIDA LLC, which he then used to invest in Agrivida Inc. on the same day, and on August 1, 2012, he transferred another $200,000 to EVERLOOP, LP, which he then used to invest in EVERLOOP Inc. on the same day.

53.     Because more than half of the Social Media Fund LP's funds had been transferred out of the partnership's bank account, GRAY paid for the September 2012 pre-IPO Twitter shares with $207,500.00 taken from other ARCHIPEL Entities' bank accounts.  For example, on September 5, 2012, GRAY took $25,000 from Agrivida LLC, $55,000 from BLOOM ENERGY LP, $7,500 from LINEAGEN LP, and $l20,000 from EVERLOOP, LP and transferred those monies to SOCIAL MEDIA FUND, LP'S account.

54.     All of this was unknown to Plaintiff McEssy, who made his first investment with the Defendants in or about October 2012 through ARCHIPELCAPITAL-BLOOM ENERGY, LP.

55.     As part of the Plaintiff's due diligence on Archipel prior to investing in ARCHIPEL CAPITAL-BLOOM ENERGY, LP, McEssy's business manager, John Hall, noted Defendants JOHN KOEPPEL, ESQ. and NIXON PEABODY's involvement with ARCHIPEL, which was a fact repeatedly emphasized by GRAY as a selling point in correspondence with the Plaintiff and Hall, as well as having KOEPPEL and NIXON PEABODY mentioned in all of the private placement memoranda and stock purchase confirmations issued by ARCHIPEL and NIXON

PEABODY.  Hall confirmed NIXON PEABODY'S status as a well-regarded national law firm with experience in the investment brokerage industry, and began to feel comfortable knowing that NIXON PEABODY would be overseeing and managing the legalities of the ARCHIPEL enterprise, including but not limited to compliance with the applicable securities laws and regulations.

56.    With regard to the Twitter deal, after learning that GRAY had bought Twitter shares at $25.50, certain investors complained that they had expected the price per share of Twitter to be lower.

57.    GRAY responded in November 2012 by having Social Media Fund LP issue "Supplement No. 1" to the PPM.  The Supplemental PPM stated that the fund "intend[ed] to use proceeds from the continued fundraising to acquire additional shares of stock of Twitter with a targeted price per share of any future purchases not in excess of $20 per share."

58.    Thereafter, in late 2012, Defendant GRAY began pitching Plaintiff McEssy on making an additional investment in Twitter through SOCIAL MEDIA FUND, LP.

59.    In or about April 2013, SOCIAL MEDIA FUND, LP also issued an "Amended and Restated" PPM, which was prepared by NIXON PEABODY and which stated that the "general partners' objective was that the holdings of the partnership (would) reflect an overall acquisition price per Twitter share not to exceed $20.00..."

60.    In April of 2013, Plaintiff McEssy got increasingly serious about investing in SOCIAL MEDIA FUND, LP, and did further due diligence, which included getting copies of stock certificates.

61.    Plaintiff McEssy invested $1,000,000.00 in Social Media Fund, LP on or about April 26, 2013.

62.     In August 2013, Plaintiff considered making an additional investment in Social Media Fund, LP.  As part of his continuing due diligence, Plaintiff's business manager, John Hall, made further inquiries of GRAY, explaining that he needed to be sure that the Twitter investment was real given everything that had happened with the Bernie Madoff fraud.  As a result, GRAY put Hall in contact with his attorney, Defendant JOHN KOEPPEL, ESQ. from NIXON PEABODY, LLP to reassure Hall about Gray and ARCHIPEL's legitimacy.

63.     Upon information and belief, Hall and Defendant KOEPPEL spoke by phone on or about August 23, 2013.  KOEPPEL assured Hall that he and NIXON work with companies like Archipel all the time and, as a national firm, NIXON would not be involved in something that was not legitimate.

64.     Upon information and belief, in or about August 2013, Social Media Fund, LP purchased an additional 55,000 shares of Twitter common stock for $22.50 per share, for a total of $1,237,500.  This purchase by SOCIAL MEDIA FUND, LP was funded by the investment of a hedge fund called MV Liquidity Fund, which invested $1,268,437.50 in Social Media Fund LP one day before the Fund's Twitter purchase.

65.     Based on KOEPPEL's assurances, on or about September 3, 2013, Plaintiff McEssy invested an additional $200,000.00 in Social Media Fund, LP, making Plaintiff's total investment in that particular vehicle $1,200,000.00.  Plaintiff received confirmation on Nixon Peabody letterhead, dated September 3, 2013, stating that SOCIAL MEDIA FUND, LP has accepted Plaintiff's $200,000.00 investment and has funded on its latest acquisition of Twitter shares.  As with every confirmation, Plaintiff was instructed to contact GREG GRAY or JOHN KOEPPEL of NIXON PEABODY with any questions.

66.     SOCIAL MEDIA FUND, LP made no additional purchases of Twitter shares before

18

Twitter's IPO on November 6, 2013.

67.     Between June 2012 and November 2013, SOCIAL MEDIA FUND, LP raised a total of $5,240,092.49 from investors and entities, representing an obligation to provide investors approximately 230,000 shares of Twitter stock if bought at the prices promised in the PPM and the supplemental PPM.

68.     However, at that time, SOCIAL MEDIA FUND, LP had only purchased 80,000 pre-IPO shares of Twitter for $1,875,000.00, at an average cost of $23.44 per share.

69.     The pre-IPO Twitter shares that SOCIAL MEDIA FUND LP purchased were restricted and could not be sold to the general public until six months after the IPO.  Upon information and belief, investors expected to receive either the Twitter shares that SOCIAL MEDIA FUND, LP had promised, and therefore had an obligation to buy, or the cash equivalent when the stock's lock-up period ended in May 2014.

70.     By the end of this "lockup" period, and as a result of Gray's frequent comingling and misappropriation of the funds raised by the Archipel Entities, Social Media Fund, LP's bank account held less than $100,000.00, leaving it with no ability to purchase the Twitter shares that it had promised to buy and distribute.

71.     Investors were expecting an additional 150,000 shares over the 80,000 pre-IPO Twitter shares that defendant GRAY had promised – or the cash equivalent at that time of approximately $4,777,500.00, based on a per share price of $31.85 as of the close of business on May 6, 2014.

72.     As he was facing these investor expectations, in April 2014, Gray began to solicit investments in a new partnership, LATE STAGE FUND L.P., telling potential investors he had a $5 million to $10 million allocation of shares in Uber.  Plaintiff McEssy was one of the

targeted investors in the Late Stage Fund, L.P.

73.     Upon information and belief, and up until that time, Plaintiff McEssy had invested $1,865,035.00 in prior Archipel Entities, including the $1,200,000.00 he invested in SOCIAL MEDIA FUND, L.P.

74.     In late May, 2014, GRAY was under increasing pressure from SOCIAL MEDIA FUND, L.P. investors to give them their promised returns.

75.     Upon information and belief, on or about May 20, 2014, Defendants GRAY and EDWARDS met with Plaintiff McEssy and his business manager, John Hall, at McEssy's office in Lake Forest, Illinois.  The purpose of the meeting was to introduce McEssy to Defendant EDWARDS, and to discuss ARCHIPEL'S investments, including Twitter, Bloom Energy, Lineagen and the newly presented deal for investing in Uber.  Upon information and belief, Defendant EDWARDS was introduced to McEssy and Hall as the "Chairman of the Board of Archipel" and a significant investor in various Archipel projects.

76.     Gray asked McEssy to invest $5 million into the Late Stage Fund, taking the full $5 million worth of UBER stock, at a $6 billion valuation, and promising that once the next UBER valuation was set, which GRAY told McEssy would be approximately $12 billion, that Gray would find him a buyer and that McEssy could sell out of the fund at the $12 billion valuation price, thereby doubling his money in a matter of months.  GRAY pressed McEssy to move quickly (as he had to in order to satisfy the Twitter investors), and told McEssy he had to act by June 10, 2014.

77.     Upon information and belief, in order to induce McEssy to make the $5,000,000.00 investment, Defendant EDWARDS impressed upon McEssy and Hall the fact that he had a successful history of business investments, and then proceeded to discuss the

merits of Archipel's strategy of investing in ventures that were close to either going public or having some other type of liquidity event for investors.  EDWARDS and GRAY also proceeded to have a conversation back and forth, in front of McEssy, whereby EDWARDS expressed disappointment that GRAY wouldn't allow him to personally invest in the UBER deal, with GRAY explaining that he wanted one lump sum investor in order to expedite things and was offering it to McEssy first in order to establish a long term relationship with him.  Upon information and belief, GRAY stated that EDWARDS still stood to benefit as co-owner of Archipel because Archipel stood to make money on the deal through fees and carried interest.

78.    Upon information and belief, defendant EDWARDS knew, or should have known, that Plaintiff McEssy's $5,000,000.00 investment in UBER was going to be used by GRAY to make up the shortfall in shares and/or cash to the Social Media Fund, LP investors, by virtue of the fact that EDWARDS was a manager of BIM with the authority to carry out BIMs management responsibilities as set forth in the various PPMs, partnership agreements, and other offering documents.  In addition, as GRAY testified before the Securities and Exchange Commission, EDWARDS and GRAY had spoken approximately three times per week every week since 2006 about the details of every deal the two of them had open at any given time, including the deals put together through each of the Archipel Entities.

79.    EDWARDS sent a follow-up email to McEssy after the May 20, 2014 meeting which included a discussion about UBER's long term value potential and "why UBER could be more valuable than Facebook someday."

80.    On May 29, 2014, Plaintiff McEssy agreed to the transaction on the terms set forth by Gray in a memorandum of understanding ("MOU") which, upon information and belief, was prepared by Defendants KOEPPEL.

81.    On May 30, 2014, Plaintiff's business manager Hall attempted to contact Defendant KOEPPEL to discuss the MOU.  KOEPPEL received Hall's voicemail and responded in a series of emails regarding setting up a time for the two of them to talk about the UBER MOU.  Upon information and belief, Hall and KOEPPEL did not speak about the MOU before KOEPPEL delivered the finished MOU to GRAY on June 4, 2014.

82.    At this time, Gray was also waiting to receive money from a settlement arising out of a mediation between EVERLOOP L.P. and Everloop, Inc.  EVERLOOP LP had asserted that Everloop, Inc. had made certain representations to EVERLOOP L.P. in connection with its investment in the company, and as a result, a settlement of $650,000.00 net (after attorney's fees) was agreed to by EVERLOOP L.P. in settlement of the claims against Everloop, Inc.

83.    As Gray was waiting to receive funds from McEssy and the Everloop settlement, of which he was to raid $350,000 from the EVERLOOP L.P. investors, GRAY assured Social Media Fund LP investors repeatedly that a distribution of their Twitter shares was forthcoming, blaming transfer agent issues for the delay.

84. On June 10, 2014, McEssy transferred $5,000,000 to the Late Stage Fund LP bank account.

85.    On or about June 12, 2014, Defendant GRAY and Plaintiff McEssy executed a letter agreement for McEssy's Late Stage Fund LP investment.  This agreement gave the partnership 21 days to acquire at least 142,857 shares of UBER stock at $35.00 per share, which represented the approximate $6 billion valuation for UBER.

86.    Also in June 2014, GRAY received $650,000 from a settlement in connection with the mediation between Everloop, LP and its then defunct portfolio company, Everloop, Inc.

87.     On or about June 19, 2014, GRAY emailed certain Social Media Fund LP investors to assure them that the transfer agent issues had been resolved and that the shares had been delayed because of a new account opening delay of the brokerage company he was using.  This was not true.

88.     He told the Twitter investors that the shares would be transferred "next week." These statements were false, as GRAY knew. At that time, GRAY had only 1,798 pre-IPO Twitter shares, which he ultimately took for himself months later, in November 2014.

89.     Instead, upon opening the account with a new brokerage firm GRAY, in late June, 2014, took nearly all of McEssy's $5,000,000 LATE STAGE FUND, LP investment, as well as approximately $350,000 from the EVERLOOP settlement, and transferred it to SOCIAL MEDIA FUND, LP investors in order to give them their expected return on investment.

90.     These payments included a $2,129,366 cash payment that went directly from the LATE STAGE FUND, LP bank account to the MV Liquidity Fund, which had invested $1,268,437.50 in SOCIAL MEDIA FUND, L.P., and $2,449,500 that was distributed back to Plaintiff McEssy, who had invested $1,200,000 in SOCIAL MEDIA FUND, LP.

91.     The redemption payment to McEssy occurred in two steps.  First, in late June, 2014, GRAY transferred $1,185,000.00 to McEssy from the Social Media Fund LP account (using funds that GRAY had transferred into that account from McEssy's own investment in the Late Stage Fund LP). GRAY then purchased 30,000 shares of Twitter at $39.50 in June 2014, sold the shares at $42.60 in July 2014, receiving $1,277,963.80. He gave a cash payment of $1,264,500.00 to McEssy, which supposedly was the second half of his expected return.  GRAY also bought approximately 30,000 shares of Twitter on the open market for $37.70 to $40.83 per share, and then days later distributed the shares to various SOCIAL

MEDIA FUND, LP investors.  In total, GRAY used $2,390,951.10 of LATE STAGE FUND, LP'S proceeds to purchase post-IPO Twitter shares to distribute to SOCIAL MEDIA FUND, LP investors.

92.     Upon information and belief, and after GRAY distributed the shares he had purchased on the open market, certain investors in the SOCIAL MEDIA FUND, LP complained that they had still received fewer Twitter shares or less money than expected. In reality, GRAY had spent $1,875,000.00 of SOCIAL MEDIA FUND, LP'S money to purchase the pre-IPO shares, and $2,125,110.55 of the LATE STAGE FUND, LP'S proceeds to purchase post-IPO Twitter shares.

93.     On or about August 1, 2014, Defendant GRAY told SOCIAL MEDIA FUND, LP investors that he would distribute the remaining $136,657.04 on a pro rata basis.

94.     As of August 11, 2014, however, SOCIAL MEDIA. FUND, LP had only $50,388.25 in its bank account. To cover that shortfall, on August 11, 2014, GRAY moved $100,000 from the ARCHIPEL CAPITAL-LINEAGEN LP bank account to the SOCIAL MEDIA FUND, LP bank account and, from August 15 to October 1, 2014, GRAY distributed approximately $135,000.00 to SOCIAL MEDIA FUND, LP investors.

95.     Since Plaintiff McEssy invested in LATE STAGE FUND, LP in June, 2014, McEssy's business manager, John Hall, repeatedly asked GRAY to provide them with documentation proving that LATE STAGE FUND, LP owned Uber shares.

96.     On or about July 17, 2014, Hall received an e-mail from GRAY with the subscription booklet for McEssy's UBER investment through Late Stage Fund, LP.  The subscription booklet listed GRAY, EDWARDS and KOEPPEL as the three key contacts for the investment.

97.     In response to Hall's persistence in demanding proof as to Plaintiff McEssy's UBER investment, GRAY emailed Hall on July 25, 2014 stating that he was waiting on a few items to be sent to him by KOEPPEL so he can send everything to Hall and McEssy at once.

98.     On or about August 8, 2014, GRAY delivered the "proof" to McEssy and Hall in the form of a fabricated document purporting to show the LATE STAGE FUND, LP'S purchase of the UBER shares.

99.     The document purported to reflect that an individual seller, Thinh Pho " sells, assigns and transfers 175,438 shares of "Uber Technology Inc." to the LATE STAGE FUND, LP.

100.    Upon information and belief, no such stock transfer agreement had ever been executed by Thinh Pho to sell Uber shares.  Instead, GRAY (or someone acting by his direction) copied and pasted the Seller's signatures from an earlier, legitimate stock-transfer agreement by which the Seller, upon information and belief, had in fact transferred shares he owned in an entirely different entity, Bloom Energy Corp., that he had executed on or about November 8, 2013, in connection with a purchase of Bloom Energy Corp. stock by ARCHIPEL CAPITAL-BLOOM ENERGY LP, a separate ARCHIPEL Entity.

101.    The stock transfer agreement purporting to evidence a purchase of Uber stock was a sham, a fact GRAY and EDWARDS knew or were reckless in not knowing, and no Uber shares were ever acquired by LATE STAGE FUND, LP, as GRAY has recently acknowledged in testimony before the SEC.

102.    Upon information and belief, The Securities and Exchange Commission has confirmed, through correspondence with UBER's counsel, that there was no record of any UBER stock ownership by Thinh Pho, the purported seller of UBER shares to LATE STAGE

25

FUND, LP, Defendant GRAY, or ARCHIPEL CAPITAL-LATE STAGE FUND, LP, BIM or BENNINGTON.

103.    Nevertheless, in December 2014, Defendant GRAY told Plaintiff McEssy that he believed that he was going to make a deal with a potential Chinese investor to "buy out" McEssy's interest in the LATE STAGE FUND, LP, the purchase price for which would be based on UBER's valuation, which at that time GRAY estimated would be approximately $12 billion.

104.    In furtherance of that transaction, on or about December 30, 2014, Defendant GRAY sent Plaintiff McEssy and his business manager, John Hall, an updated "letter of intent" purporting to evidence a deal whereby a Chinese investor by the name of YunHan Shang would be purchasing 100% of the assets of Late Stage Fund for $30,000,000.00.

105.    Upon information and belief, as of February 20, 2015, the Late Stage Fund bank account showed a balance of only $481,184.05.

106.    Upon information and belief, all of the money Plaintiff McEssy invested in LATE STAGE FUND, LP was taken by GRAY and used by him to satisfy the obligations to deliver shares and/or cash to those investors who had purchased Twitter stock through SOCIAL MEDIA FUND, LP, including Plaintiff McEssy, but found that the stock was not available for purchase because of GRAY's acts of fraud and deceit with regard to the collection of, use of and ultimate wasting of the money that was contributed to the SOCIAL MEDIA FUND, LP for the purchase of Twitter shares.

107.    While GRAY now claims that McEssy's "allocation" was moved into Lyft, Inc. (an Uber competitor) and other well-known pre-IPO stocks, he had not told Plaintiff McEssy, at least as of December 2014, that Late Stage Fund LP did not purchase Uber shares as

represented.

108.   Neither GRAY, EDWARDS, ARCHIPEL, BIM, SOCIAL MEDIA FUND, LP nor LATE STAGE FUND, LP have ever made up the difference.

109.   Upon information and belief, the confirmations sent to and received Plaintiff from Gray, Archipel and Nixon Peabody were a sham, as GRAY never had any intention to deliver the full amount of shares.  At no time did GRAY'S partner EDWARDS stop or control his actions, even though GRAY was in constant contact with EDWARDS with regard to the Archipel investment vehicles, and he was aware of the shortfall of the Twitter stock, the shorted delivery, and the failure to purchase UBER shares as represented.

110.   In all, GRAY's conduct, both in his individual capacity and as a fiduciary for the ARCHIPEL investors, has been purposeful, reckless and intentional.  GRAY was assisted in his scams and his PONZI type arrangement with the help of ARCHIPEL, BIM, EDWARDS, BENNINGTON, KOEPPEL and NIXON PEABODY.  Without the active participation of each of the Defendants herein, GRAY would not have been able to get Plaintiff to repeatedly invest in the ARCHIPEL limited partnerships and LLC's, thereby subjecting the Plaintiff to losses arising out of the PONZI-like scheme deliberately conceived by GRAY to defraud and injure the Plaintiff herein.

111.   As a direct and proximate result of the conduct of GRAY, EDWARDS, ARCHIPEL, LLC, the ARCHIPEL entities (funds), BIM, BENNINGTON, KOEPPEL and NIXON PEABODY, Plaintiff McEssy has been deprived of, and has lost the entire $5,000,000.00 investment he made in LATE STAGE FUND, LP, and has also lost any chance to be fulfilled upon the contract that he had made with Defendant GRAY to receive $10,000,000.00 in payment for the UBER stock based on the $12 billion valuation as initially promised by GRAY at the time

he and EDWARDS induced the Plaintiff to pay $5,000,000.00 into LATE STAGE FUND, LP in order to make up the shortfall in SOCIAL MEDIA FUND, LP.

112.    Upon information and belief, the amount in controversy exceeds the monetary threshold of all lower courts.

## FIRST CLAIM FOR RELIEF
**(Violation of §10(b) of the Securities and Exchange Act of 1934 and 17 C.F.R. 240.10b-5 (Rule 10b-5) as Against Gray, Edwards, Archipel, BIM, Bennington, Koeppel, Nixon Peabody and the Archipel Entity Funds)**

113.    Plaintiff hereby repeats and re-alleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

114.    Defendant Gray, directly, singly and in concert, by the use of the mail and means and instrumentalities of interstate commerce, as well as through oral communications made at in-person meetings, in connection with the purchase or sales of securities, knowingly or recklessly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and/or courses of business which operated as a fraud and deceit upon investors, purchasers of securities, and other persons.

115.    Upon information and belief, GRAY and EDWARDS knowingly transmitted to the Plaintiff herein and disseminated, directly and/or through agents, officers, or employees of ARCHIPEL CAPITAL, LLC and BIM MANAGEMENT, LP, materially false and misleading statements describing and recommending the purchase of interests in Archipel/BIM managed limited partnerships (SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP), promising that the limited partnerships would use the Plaintiff's money to purchase approximately 230,000 pre-IPO shares of Twitter and $5,000,000.00 worth of Uber shares, thereby obligating GRAY,

EDWARDS, ARCHIPEL, BIM  and BENNINGTON to make such purchases on behalf of the limited partnerships.

116.    Upon information and belief, and at the time of the misstatements, omissions, concealments, and fraudulent activities as described above, Defendants Gray and Edwards knew or reasonably should have known that such statements were materially false and misleading and omitted facts required in order to make the statements made, in light of the circumstances under which they were made, not misleading, but knowingly or recklessly made such statements to the Plaintiff in order to induce him to invest significant sums of money in Social Media Fund, LP and Late Stage Fund, LP.

117.    Plaintiff reasonably relied upon the information provided and the statements made by the defendants Gray and Edwards and the other Archipel Entities, including BIM, Bennington, and others, their controlling partners and others recommending the purchase of the securities, the investment of the money, and the transfer of the funds.

118.    Upon information and belief, at the time Plaintiff McEssy made the investments, he had no knowledge that the information and recommendations provided by the defendants contained material misstatements, or otherwise were fabrications, made up of misstatements of material facts and omissions, concealments, and otherwise fraudulent documentation, including private placement memoranda containing false statements regarding Gray's credentials and licensing, as well as omitting Gray's disciplinary history of censure and loss of license.

119.    Upon information and belief, the Plaintiff herein would not have committed to invest the $5,000,000.00 with the defendants herein but for the materially false and misleading information provided to the Plaintiff by the Defendants herein, jointly, severally, individually, directly, or indirectly.

120.    As a direct and proximate result of the investments made herein, Plaintiff McEssy has been damaged and his original investment and capital has been substantially depleted and he has been substantially injured, and the Plaintiff has lost any chance of ever recouping the promised amount of $10,000,000.00 in expected return on investment as initially promised and described by the defendants herein.

121.    As a result, Plaintiff McEssy hereby demands judgment as against defendant Gray pursuant to Section 10(b) of the Exchange Act and pursuant to Rule 10(b)(5), together with such other and further relief as to the Court may seem just and proper, including punitive damages, treble damages, and such other damages for the willful, wanton, gross and reckless disregard of the rights of the Plaintiff and the other consuming public.

122.    Defendants GRAY, EDWARDS, KOEPPEL, NIXON, the ARCHIPEL Defendants, including BIM, and BENNINGTON, and each of them, further violated Section 10(b) of the Exchange Act and Rule 10b-5 when GRAY fraudulently commingled and transferred money between the ARCHIPEL Defendant Entities, failed to purchase and deliver the proper number of shares of Twitter and UBER as promised to, and paid for by the Plaintiff, and engaging in a Ponzi-like scheme intended to defraud investors, and when Koeppel and Nixon prepared and delivered fraudulent purchase confirmations to investors in furtherance of this Ponzi-like scheme, all of which resulted in further losses and damages to the Plaintiff as a result of these fraudulent misrepresentations and maneuverings.

123.    Additionally, NIXON PEABODY and KOEPPEL, acting in concert with each other and the other Defendants, disseminated false PPMs that Plaintiff McEssy relied upon in making an investment in Social Media Fund, LP by omitting GRAY's disciplinary history. GRAY, EDWARDS, KOEPPEL and NIXON PEABODY intentionally omitted this information

30

with full knowledge that the Plaintiff would be concerned about GRAY's participation in the solicitation and management of his investments through private-placement limited partnership offerings.

124.   Despite specific knowledge of GRAY's disciplinary history, Defendants GRAY, EDWARDS, KOEPPEL, and NIXON PEABODY proceeded to make the false statement in the Management section of the PPMs that GRAY "is a registered investment advisor for NASD Licenses: Series 6,7, 63, 65."  This statement regarding GRAY's registration and licensure was and is false; Defendants GRAY, EDWARDS, KOEPPEL and NIXON PEABODY had specific knowledge of the details of GRAY's disciplinary history, and thus, knew these statements were false and misleading when they included them in the PPM's and disseminated them to prospective investors in 2011, 212, 2013, and 2014, including Plaintiff McEssy when he invested in the Social Media Fund, LP.

125.   Defendants GRAY, EDWARDS, KOEPPEL and NIXON PEABODY intentionally and/or recklessly made these false statements in the PPMs in order to conceal GRAY's disciplinary history from prospective investors, including Plaintiff McEssy, and induce him to invest in Archipel/BIM managed limited partnerships.

126.   Plaintiff relied on the misstatements and false representations made by Gray, Edwards, Koeppel and Nixon in the PPMs in deciding whether to invest, purchase or otherwise acquire the limited partnership interests being offered by Gray, Edwards, Archipel, BIM, Bennington and the Archipel Entities, and Defendant Gray's actions in conformity with the concealed and omitted information resulted in the loss of Plaintiff's investment.

127.   NIXON PEABODY and KOEPPEL also were responsible for receiving Plaintiff McEssy's money on behalf of the various Archipel entities, including the Social Media Fund, LP

and Late Stage Fund L.P., and violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 when they delivered a false and fabricated confirmation to Plaintiff McEssy, on Nixon Peabody letterhead, falsely stating that Social Media Fund, LP had funded the promised acquisition of Twitter shares; a statement which was, upon information and belief, known to Nixon Peabody and Koeppel to be false at the time it was made to Plaintiff McEssy.

128.     By reason of the foregoing, Defendants GRAY, EDWARDS, KOEPPEL, NIXON, ARCHIPEL, BIM, BENNINGTON and the ARCHIPEL ENTITIES have violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5), and the Plaintiff is entitled to judgments against said defendants, individually, jointly and severally, for compensatory damages in an amount to be proven at trial, punitive damages, interest, costs, disbursements and attorney's fees.

## SECOND CLAIM FOR RELIEF
### (Control Liability Pursuant to §20(a) of the Exchange Act as Against Gray, Edwards, Koeppel and Nixon Peabody)

129.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

130.     As set forth above, Defendants GRAY, EDWARDS, ARCHIPEL, the ARCHIPEL Defendants (funds), BIM, BENNINGTON, BELP, KOEPPEL and NIXON PEABODY, have violated the Exchange Act and Rule 10b-5, and each of them, in that they, knowingly and intentionally made repeated misrepresentations and omissions of material fact to the Plaintiff in connection with the purchase and/or sale of securities for the specific purpose of inducing the Plaintiff to buy in to the ARCHIPEL Entities' investment vehicles, and also by engaging in scheme to defraud investors through the commingling of funds among the Archipel Entities and using funds of one entity to pay false returns to investors in other entities and fabricating

documents and delivering them to the investors in furtherance of the scheme to defraud.

131.   Plaintiff reasonably relied on the misrepresentations and omissions of material fact made by the Defendants and, as a direct result of said misrepresentations and omissions, the Plaintiff suffered significant monetary losses.

132.   In addition to Defendant GRAY's role as a direct and primary perpetrator of the above stated violations under Section 10(b) of the Exchange Act and Rule 10b-5, Defendant GRAY, at all times relevant herein, was a control person of ARCHIPEL CAPITAL, LLC and every other ARCHIPEL entity Defendant (i.e., BELP, BLOOM ENERGY, LP, LINEAGEN, LP ARGIVIDA, LP, LATE STAGE FUND, LP AND   SOCIAL MEDIA FUND(S), LP), and including BIM and BENNINGTON, within the meaning of Section 20(a) of the Exchange Act.

133.   GRAY is a control person within the meaning of Section 20 of the Exchange Act and therefore liable for the above Section 10(b) and Rule 10b-5 violations by virtue of, among other things, GRAY's 65.1% ownership interest in ARCHIPEL, LLC, his roles as a Board Observer of the Everloop Board of Directors, manager of BIM, Advisory Board member of BENNINGTON, and his direct role in the solicitation of investors for the ARCHIPEL Defendants (funds) and BELP.

134.    BIM was the Managing Member or General Partner of each of the ARCHIPEL entity funds, including BELP, with broad investment and operational discretion.

135.   GRAY is listed in the PPMs for the ARCHIPEL Entities as a primary contact for BIM, along with EDWARDS.  GRAY, on behalf of BIM, signed all, or substantially all of the subscription agreements for the various ARCHIPEL Entity limited partnerships, including BELP.

136.    GRAY opened separate bank accounts and brokerage accounts for each ARCHIPEL Entity, and has signatory authority on each bank account and trading authorization over each Entity's brokerage account.

137.    GRAY's culpable participation in the above Section 10(b) and Rule 10b-5 violations, for purposes of liability under Section 20(a), is based on, among other things, the fact that he personally and fraudulently operated a Ponzi-like scheme to defraud investors in the various Archipel entities, specifically with regard to his failure to purchase the promised shares of Twitter and UBER and the corresponding failure to return Plaintiff's $5,000,000.00 dollar investment in Late Stage Fund, LP.

138.    At all relevant times, Defendant EDWARDS possessed, directly or indirectly, the power to direct and control Defendants GRAY, ARCHIPEL, the ARCHIPEL Entity Defendants, BIM, and BENNINGTON, acted as a control person of said Defendants within the meaning of Section 20(a) of the Exchange Act, and is therefore personally liable for the above described violations of Section 10(b) of the Exchange Act and Rule 10b-5.

139.    Defendant EDWARD's status as a control person is based on, among other things, his 25% ownership of ARCHIPEL, a general partner of BIM; the fact that he is one of two managers of BIM; listed as a contact person for BIM along with GRAY on the PPMs; is the sole owner of BENNINGTON, another general partner of BIM; has personal signatory authority on five of the ARCHIPEL Entities' bank accounts—including two with nearly all of the ARCHIPEL Entities' current liquid assets; and his status as senior, and most influential business partner and mentor to GRAY who has consulted with GRAY approximately three times per week every week since 2006 regarding every investment deal he and GRAY have open and operate together, which includes every investment deal involving the ARCHIPEL Entities.

140.    In addition to EDWARD's ability to actually control the actions of GRAY, EDWARDS' culpable participation in the above Section 10(b) and Rule 10b-5 violations is based on, among other things, the fact that he was GRAY's senior partner with regard to the Archipel investment vehicles, was brought in by Gray to personally meet with the Plaintiff and sell the Plaintiff on the investment opportunities being offered by the Defendants when he knew, or should have known, that there was a shortfall in the Social Media Fund account and Gray had no intention of investing Plaintiff's money in Uber through Late Stage Fund, LP because he had to make up for the shortfall; and on his constant communications with Gray about the Archipel investments, knowingly and intentionally allowing and/or recklessly allowing the fraudulent PPMs to be disseminated to the Plaintiff in order to induce the Plaintiff to invest while Defendant Edwards stood to make money from management fees and carried interest, and knowingly and/or recklessly failing to stop or prevent GRAY from operating a Ponzi-like scheme designed to defraud investors and which resulted in the loss of the Plaintiff's investment.

141.    Defendants NIXON PEABODY and KOEPPEL are a control person and/or entity of Defendants GRAY, ARCHIPEL, the ARCHIPEL Entity Defendants, including BIM and BENNINGTON, all within the meaning of Section 20(a) of the Exchange Act, and therefore NIXON PEABODY and KOEPPEL are liable for the above described violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5.

142.    Defendants NIXON PEABODY and KOEPPEL's status as a control person and/or entity is based upon, among other things, the fact that all notices, requests, demands and other communications concerning the Social Media Fund, LP and Late Stage Fund LP shall be directed at GRAY with a copy to be sent to Nixon Peabody and Koeppel, knowingly and intentionally drafting and/or allowing and/or recklessly allowing the SOCIAL MEDIA FUND,

35

LP PPM to be disseminated to the Plaintiff with material misstatements and falsehoods in order to induce the Plaintiff to invest while NIXON PEABODY and KOEPPEL stood to make money from legal fees, their awareness and/or intimate knowledge of the false and misleading statements that were disseminated to Plaintiff McEssy and other potential investors, their ability to prevent the issuance of the false statement or cause the statements to be corrected, their position as counsel to the SOCIAL MEDIA FUND, LP, LATE STAGE FUND, LP, BIM and ARCHIPEL CAPITAL, LLC, the power they had to influence and control, directly or indirectly, the decision making of investors through reassuring Plaintiff McEssy and other investors of the legitimacy of the Archipel enterprise specifically to induce Plaintiff's investment in the Archipel/BIM offerings, and knowingly and/or recklessly failing to stop or prevent GRAY from operating a Ponzi-like scheme designed to defraud investors including Plaintiff McEssy when KOEPPEL and NIXON were counsel to BIM, ARCHIPEL and the ARCHIPEL ENTITIES in connection with the operation of the Partnership and/or other legal matters related to the General Partner and their affiliates, including making, holding and disposing of investments, and where all investments made by the limited partners were directed to, and received by, KOEPPEL and NIXON PEABODY accordingly.

143.    As a direct and proximate result of GRAY, EDWARDS, NIXON PEABODY, and KOEPPEL'S conduct as primary perpetrators and/or control persons of the primary perpetrators of the above Section 10(b) and Rule 10b-5 violations, the Plaintiff has suffered damages in connection with his investments in the ARCHIPEL/BIM/BENNINGTON investment vehicles and Defendants Gray, Edwards, Archipel, BIM, Koeppel and Nixon are liable for the Plaintiff's damages, individually, jointly and severally, pursuant to Section 20(a) of the Securities and Exchange Act of 1934.

## THIRD CLAIM FOR RELIEF
**(Violation of § 12 of the Securities Act of 1933 as Against Gray, Edwards, Archipel Capital, the Archipel Entities, BIM, and Bennington)**

144.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.    The Defendants GRAY, EDWARDS, ARCHIPEL CAPITAL, BIM, BENNINGTON and THE ARCHIPEL ENTITIES sold the aforesaid securities and investment interests to the Plaintiff by means of oral and written communications which contained material misstatements and misrepresentations and/or omissions and concealments, and was disseminated by use of the means and instruments of transportation or communication in interstate commerce or of the mail.

146.    Plaintiff, without knowledge of the falsity of the Defendants' statements and material omissions and concealments in the written materials provided by the Defendants, including but not limited to the PPMs, advertising materials and other offering documents, as well as the oral misrepresentations and intentional misstatements of material fact made orally to the Plaintiff by the Defendants GRAY, EDWARDS and KOEPPEL at in-person meetings, telephonically and otherwise, as described above, and reasonably believing such statements to be true, purchased investments and investment interests from the Defendants.

147.    Plaintiff would not have purchased the investments but for the materially false and misleading information provided to him by the Defendants.  By virtue of the foregoing,

Plaintiff has been damaged and is entitled to damages and other relief as a result of the

Defendants' violation of § 12 of the Securities Act of 1933 as alleged herein.

## FOURTH CLAIM FOR RELIEF
### (RICO 18 U.S.C. § 1962)

148.    Plaintiff hereby repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

149.    Upon information and belief, the Defendants currently known and/or unknown

additional individuals, and entities, who were parties to the fraud purported by the defendants are

each a "person" within the meaning of 18 U.S.C. § 1961(3).

150.    Upon information and belief, the Defendants GRAY, EDWARDS, KOEPPEL,

BIM, BENNINGTON, NIXON PEABODY, and others, including the Archipel partnerships and

LLCs, BENNINGTON and its entities and the association in fact amongst each of the aforesaid

entities constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) which are engaged

in, or activities of which affect or affected, interstate commerce.

151.    Upon information and belief, and since at least as early as 2011, the defendants

herein, jointly, severely, individually, and as a group have engaged in an ongoing scheme to

defraud, profit from the fraudulent sale of securities, and the investment of money in to limited

partnerships and LLCs that were constructed, used, designed, or otherwise to intentionally injure

Plaintiff who invested in such partnerships, and the Plaintiff McEssy individually.

152.    In carrying out this scheme, the defendants herein operated the affairs of

ARCHIPEL CAPITAL, LLC, THE ARCHIPEL ENTITIES, BIM, BENNINGTON, and the

association in fact of all of the defendants herein by and through a "pattern of racketeering

activity" within the meaning of 18 U.S.C. 1961(1)(B) and (5) all in violation of 18 U.S.C. §

1962(c) including acts indictable under 18 U.S.C. § 1341, commonly known as the "Mail Fraud Statute" 18 U.S.C. 1343, commonly known as the "Wire Fraud Statute".

153.   Upon information and belief, the defendants herein, and each of them, jointly, severally, individually, or otherwise, and as a whole participated in the fraud perpetrated upon the Plaintiff herein and others, by performing functions necessary or helpful to the enterprise's operations and affairs in rising millions of dollars in investment capital from investors and in offering securities including regular ongoing securities offered through private placement memorandums between 2011 and 2014.  The investment capital was raised through a fraudulent course of conduct as described above, including the acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and § 1961(1)(D).

154.   Upon information and belief, the defendants engaged in such a pattern of racketeering activity described herein with the knowledge that potential purchasers would be defrauded and, injured, that the interstate mails and wires would be used to further the racketeering enterprises identified herein, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, with the knowledge that such mail fraud and illegal utilization of interstate wires was essential to further the fraudulent scheme.

155.   In violation of 18 U.S.C. § 2, defendant Gray and the other defendants named herein, all aided and abetted each other to perform the violations of the RICO statute alleged herein, as well as the primary acts of mail fraud, wire fraud, and fraud in the offer or sale of securities alleged herein, in the interests of the relative limited partnerships and the LLCs herein, and the definitive fraud that was carried on against the Plaintiff McEssy herein, and purposely, and fraudulently taking $5,000,000.00 of Plaintiff McEssy's money with no intent, or

wherewithal, to invest the money or otherwise in any way use the money for the purpose and manner intended and as agreed upon by and between the parties hereto.

156.    Upon information and belief, the described acts of racketeering occurred after the effective date of the RICO statute, and all within ten years of each other, and more specifically within the time period between 2011 and 2014.

157.    As a direct and proximate result of the RICO violations described herein, and as a result of the fraud perpetrated upon the Plaintiff McEssy, and as a result of the continuing and ongoing fraudulent actions and activities of the defendants and each of them herein, the Plaintiff has been injured through his business and/or property by reason of losses of substantial portions of the money invested by him in the fraudulent activities marketed by and through the defendants herein.

158.    Upon information and belief, the Plaintiff relied upon defendant GRAY'S misrepresentations, and omissions, with regard to the purchase of the underlying securities which defendant Gray sought to have the Plaintiff McEssy purchase, and but for those misrepresentations, omissions, concealments, or otherwise, the Plaintiff herein would not have sought to purchase the shares of UBER stock as provided herein, or otherwise give to the Late Stage Fund LP, $5,000,000.00 with which the intent was to purchase the UBER shares accordingly.

159.    Pursuant to 18 U.S.C. § 1964, the Plaintiffs is entitled to receive trouble damages in an amount to be determined at the time of trial, together with reasonable attorney's fees, and punitive damages for the willful, wanton, and reckless disregard of the rights of the Plaintiff, and the fraud perpetrated upon the Plaintiff, together with such other and further relief as to the Court may seem just and proper.

## FIFTH CLAIM FOR RELIEF

**(Fraud as Against Gray, Edwards, Archipel, BIM, Bennington, Koeppel, Nixon Peabody and the Archipel Entity Funds)**

160.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.     As described above, Defendants GRAY and EDWARDS made representations of fact to the Plaintiff with regard to the purchases of stock made and/or to be made by SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP, for the sole purpose of inducing the Plaintiff to invest his money in SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP, all of which were false.

162.     Defendants GRAY and EDWARDS, together with KOEPPEL and NIXON PEABODY, also made representations of fact and omissions of fact in the PPMs with regard to the credentials and licensure of Defendant GRAY, all of which were false and all of which the Defendants caused to be disseminated to prospective investors, including the Plaintiff, for sole the purpose of inducing their investment.

163.     Defendants GRAY, EDWARDS, KOEPPEL and NIXON knew that such representations were false when they made them and/or they made such representations and omissions recklessly without regard for whether they were true or false.

164.     The Plaintiff herein, without knowledge of the falsity of the Defendants' representations, and each of them, and the material acts and omissions and concealments as described above, and believing that such statements were true at the time that said statements were made, and believing that such statements were true and complete, and in reasonable justifiable reliance upon the statements and representations made by the defendants herein, their agents, officers, employees, and/or co-conspirators, as previously set forth herein, purchased

investments and investment interest in relying upon the truth and completeness of the statements contained in the written materials, including the PPMs, and all other written documents, statements and representations, both oral and written, made by GRAY, EDWARDS, KOEPPEL and NIXON PEABODY, their agents, officers, employees, co-conspirators, and others, as previously set forth above.

165.    Upon information and belief, the Plaintiff would not have made the investments in SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP except for his reliance upon the misrepresentations and omissions made by the Defendants with regard to the offering of such investments for sale.

166.    At the time of the false statements, misrepresentations, omissions and concealments set forth above, each of the Defendants intended that the Plaintiff act on the basis of such misrepresentations, omissions, concealments and forgeries and other wrongful activities as contained in the materials as set forth above, and the representations in deciding whether to purchase the investments and/or investment interest, and the Plaintiff justifiably relied on the aforesaid misrepresentations, omissions, concealments, forgeries and other wrongful activities to his detriment in making such decision.

167.    Upon information and belief, all of the wrongful acts of the Defendants as set forth herein are incorporated by reference herein, and each wrongful act and/or allegation constitutes a separate injury suffered by the Plaintiff.

168.    Upon information and belief, had Plaintiff herein known of the material falseness of the facts that were made to him, and had the Plaintiff known that the Defendants wrongfully concealed, misrepresented, created false documents, and otherwise known of the falsity of the defendants' representations, the Plaintiff would not have made the investments as alleged herein.

169.     Upon information and belief, the Plaintiff, as a result of the purchase  of the limited partnership interests in SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP, and by reason of the Defendants wrongful concealments, omissions, misrepresentations, forgeries and other wrongful conduct, has sustained damages, suffered mental and emotional distress, has lost a substantial part of his prospective investment, together with lost interest, and general and incidental damages in an amount yet to be determined and proven at the time of trial.

170.     By reason of the foregoing, the defendants herein are jointly, severally, individually, and/or otherwise together liable to the Plaintiff in such a fair and reasonable amount as may be determined by a jury of the Plaintiff's peers, together with reasonable attorney's fees, treble damages, and punitive damages as same may be determined by a jury of Plaintiff's peers for the willful, wanton, and reckless disregard of the rights of the Plaintiff, the fraudulent activities conducted by the Defendants, and the outright fraud, as said fraud was aimed at, and directed to the Plaintiff in this matter.

171.     Upon information and belief, given the willful, wanton and reckless disregard of the rights of the Plaintiff herein, and the fact that said misrepresentations, omissions, forgeries and fraud was aimed at the public generally, Plaintiff herein is entitled to exemplary or punitive damages in addition to all other damages allowed by law, in such other reasonable amount as to a jury of his peers may deem adequate under the circumstances.

### SIXTH CLAIM FOR RELIEF
**(Breach of Contract as Against Gray, Edwards, Archipel Capital, BIM, Bennington and the Archipel Entities)**

172.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

173.      Upon information and belief, and on or about May 29, 2014, Plaintiff McEssy and

the Defendant GRAY, acting on his own behalf, and/or as agent, officer, employee, and business partner of Defendants EDWARDS, BIM, ARCHIPEL CAPITAL AND ARCHIPEL CAPITAL-LATE STAGE FUND, LP, and with EDWARDS' full knowledge and consent, entered into an agreement whereby Plaintiff McEssy would contribute the sum of $5,000,000.00 and otherwise make that investment into the LATE STAGE FUND, LP, a fund owned, managed, operated, and controlled by Defendants GRAY and EDWARDS, and in return, as part of the contract agreement, McEssy would be able to sell the aforesaid shares at a valuation of approximately $12 billion, or make a 100 percent return upon the money that was being invested, during the course of the 2014 year.

174.    Upon information and belief, the defendant GRAY, by and through the LATE STAGE FUND, LP, a fund owned, controlled, managed, and otherwise controlled by and/or in concert with Defendant EDWARDS, breached the aforesaid contract and failed to, in any manner or method, live up to the terms and conditions of the Agreement.

175.    As a direct and proximate result of the breach of contract by the Defendants herein, and without any fault of the Plaintiff McEssy contributing thereto, Plaintiff McEssy has been damaged in a fair and reasonable amount of $10,000,000.00, together with such other interest, costs, and disbursements as well as attorney's fees, all as a result of the breach of contract by the Defendants collectively herein.

176.    As a result of the foregoing, Plaintiff McEssy hereby seeks judgment as against the Defendants, and each of them, jointly, severally, and/or otherwise in the amount of $10,000,000.00, together with costs, disbursements, interest, legal fees, and all other costs affiliated with the collection herein.

**SEVENTH CLAIM FOR RELIEF**

**(Conversion as Against Gray, Edwards, Archipel Capital, the Archipel Entities, BIM, Bennington, Koeppel and Nixon Peabody)**

177.    Plaintiff hereby repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

178.    Upon information and belief, the Plaintiff is the rightful owner of monies received by Defendants GRAY, EDWARDS, BIM, KOEPPEL and NIXON PEABODY in connection with securities investments and limited partnership interests that were sold by the Defendants to the Plaintiff under false pretenses.

179.    Plaintiff's interest in these monies is superior to any interest that the Defendants may claim in the aforesaid monies.

180.    In unlawfully taking Plaintiff's monies and controlling and expending the funds for their own purposes, the Defendants have converted the funds belonging to the Plaintiff, and have otherwise injured the Plaintiff herein.

181.    Defendants have intentionally exercised dominion and control over such funds in such a manner inconsistent with and in willful disregard of the Plaintiff's interest.

182.    Defendants have acted consciously, willfully, wantonly and maliciously in converting the funds, assets, property, and investments of the Plaintiff.

183.    As a direct and proximate result of the conversion of Plaintiff's monies by the Defendants, Plaintiff has been damaged in an amount to be determined at the time of trial, together with punitive or exemplary damages for the wanton, willful and reckless disregard of the rights of the consuming public and the Plaintiff specifically.

184.    In converting the aforesaid monies, the Defendants, both individually, jointly, severally, and/or otherwise, acted willfully, wantonly, knowingly and in reckless disregard of the rights of the Plaintiff and the consuming public.

185.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants, and each of them, for compensatory damages in an amount to be proven at trial, for punitive or exemplary damages in an amount to be proven at trial, together with appropriate interest, costs, disbursements, attorney's fees, and such other and further relief as to the Court may seem just and proper.

### EIGHTH CLAIM FOR RELIEF
#### (Unjust Enrichment as Against all Defendants)

186.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    The Defendants, and each of them, benefitted from the receipt of funds, assets and/or property received from the Plaintiff and for which the Defendants did not adequately compensate or provide value to the Plaintiff.

188.    The Defendants, and each of them, were enriched at the expense of the Plaintiff.

189.    Under principles of equity and good conscious, the defendants are required to pay back to Plaintiff the amount of the total unjust enrichment, as the Defendants' enrichment as described herein has occurred through fraudulent means, and the Plaintiff has received nothing in return from the initial payment of $5,000,000.00 to the Defendants herein.

190.    As a direct and proximate result of the aforesaid, Plaintiff hereby seeks judgment as against the Defendants, and each of them jointly, severally, or individually, in such fair and reasonable amount as may be awarded by a jury of their peers, and in an amount not less than $5,000,000.00, together with interest, costs, disbursements, attorney's fees and punitive damages in such fair and reasonable amount as may be determined by a jury of his peers.

### NINTH CLAIM FOR RELIEF
#### (Violation of General Business Law § 349 as Against Gray, Edwards, Archipel Capital, the Archipel Entities, BIM, Bennington, Nixon and Koeppel)

191.    Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs as though fully set forth herein.

192.    Upon information and belief, the defendants, and each of them, acting individually, jointly, severally, and/or together and in concert with one another and in conduct in the furtherance of their scheme to use deceptive acts and practices in the conduct of business, or in the furnishing of a service, within the meaning of Section 349 of the General Business Law of the State of New York, and as such, are unlawful.

193.    Upon information and belief, the same acts and conduct used by defendants to defraud the plaintiffs have been used repeatedly, and are of a recurring nature.

194.    Upon information and belief, the acts or conduct of the defendants herein, individually, jointly, severally, and in concert, by which they knowingly and fraudulently misrepresented to potential purchasers, including the Plaintiff, the fraudulent nature of the business investments that the defendants were selling to the Plaintiff, affect the public interest at large, and the particular interests of the plaintiff herein.

195.    As a direct and proximate result of the defendants unlawful acts and conduct in violation of Section 349 of the New York State General Business Law, the plaintiff has been damaged in such fair and reasonable amount as be proven at the time of trial, but in no less amount than $5,000,000.00, together with exemplary or treble damages, punitive damages, and for the willful, wanton, and reckless disregard and reckless misrepresentations that were made to the plaintiff, together with such and further relief as to the Court may seem just and proper and to the jury of plaintiff's peers.

## TENTH CLAIM FOR RELIEF
### (New York State Debtor and Creditor Law § 273 as Against All Defendants)

196.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.     The Defendants incurred or caused to be incurred obligations without fair consideration, rendering themselves insolvent.

198.     These obligations include the various amounts owed to the Plaintiff as a result of his investments in SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP.

199.     As a result of the foregoing, Defendants owe substantial sums of money to the Plaintiff in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (New York State Debtor and Creditor Law § 274 as Against All Defendants)

200.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.     The Defendants made conveyances without fair consideration leaving remaining property to constitute an unreasonable small capital.

202.     Such conveyances included various improper payouts to the Defendants, their employees, family and friends.

203.     As a result of the foregoing, the Defendants owe substantial sums to the Plaintiff in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (New York State Debtor and Creditor Law § 275 as Against All Defendants)

204.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.     The Defendants made conveyances without fair consideration intending or believing that they would incur debts beyond their ability to pay as they matured.

206.     Such conveyances included various improper payouts to the Defendants, their employees, family and friends.

207.     As a result of the foregoing, Defendants owe substantial sums to the Plaintiff in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (New York State Debtor and Creditor Law § 276 as Against All Defendants)

208.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.     The Defendants made conveyances and incurred obligations with actual intent to hinder, delay or defraud either present or future creditors.

210.     Such conveyances included various improper payouts to the Defendants, the Defendants' employees, family and friends.

211.     As a result of the foregoing, Defendants owe substantial sums to the Plaintiff, in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
### (Constructive Trust and Accounting as Against All Defendants)

212.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

213.     As set forth above, the assets of the Plaintiff have been wrongfully diverted as a result of fraudulent acts and omissions in violation of the securities laws, breaches of fiduciary duties, conversions and other wrongdoing of Defendants GRAY, EDWARDS, ARCHIPEL, BIM, KOEPPEL and NIXON PEABODY for their own interests and enrichment.

214.     Defendants GRAY, EDWARDS, ARCHIPEL, BIM, BENNINGTON, KOEPPEL and NIXON PEABODY had a confidential and/or fiduciary relationship with the Plaintiff and, as

49

such, had a duty to act with reasonable care to ensure that the money invested in SOCIAL

MEDIA FUND, LP and LATE STAGE FUND, LP were used for its intended purpose.

215.    Upon information and belief, in furtherance of the fraud perpetrated by the

Defendants herein, Defendants wrongfully transferred approximately $2,129,366.00 of the

Plaintiff's money directly from the LATE STAGE FUND, LP bank account to the bank account

of Defendant MV LIQUIDITY FUND I, LLC and/or MV LIQUIDITY FUND, LLC, in violation

of federal and state law, and MV LIQUIDITY FUND I, LLC, MV LIQUIDITY FUND, LLC

and/or MICROVENTURE MARKETPLACE, INC. have thereby been unjustly enriched at the

expense of the Plaintiff.

216.    Upon information and belief, Defendants GRAY, EDWARDS, ARCHIPEL,

BIM, BENNINGTON, and the ARCHPEL ENTITIES, and each of them, unlawfully retained

and/or paid themselves money of the Plaintiff in the form of management fees and other

compensation in connection with the Plaintiff's investments in SOCIAL MEDIA FUND, LP and

LATE STAGE FUND, LP, and have therefore been unjustly enriched at the expense of the

Plaintiff.

217.    Upon information and belief, Defendants KOEPPEL and NIXON PEABODY

wrongfully benefited from and/or retained money of the Plaintiff in the form of attorney's fees

arising out of the unlawful and fraudulent management and transfer of the money Plaintiff

invested with the Defendants for its limited partnership interests in SOCIAL MEDIA FUND, LP

and LATE STAGE FUND, LP, and were therefore unjustly enriched at the expense of the

Plaintiff.

218.    As stated herein, Defendants GRAY, EDWARDS, ARCHIPEL CAPITAL, LLC,

BIM, BENNINGTON, the ARCHIPEL ENTITIES, KOEPPEL, NIXON PEABODY,

MICROVENTURE MARKETPLACE, INC., MV LIQUIDITY FUND, LLC AND/OR MV

LIQUIDITY FUND I, LLC have all been unjustly enriched at the expense of the Plaintiff herein,

and have received and/or are holding the property of the Plaintiff under such circumstances that

in equity and good conscience they ought not to retain it.

219.    The Plaintiff has no adequate remedy at law.

220.    Due to the fraudulent acts and omissions in violation of the securities laws, fraud,

conversion and other unlawful conduct of the Defendants as described herein, Plaintiff is entitled

to the imposition of a constructive trust as against MICROVENTURE MARKETPLACE, INC.,

as successor in interest and/or sponsor of MV LIQUIDITY FUND, LLC and MV LIQUIDITY

FUND I, LLC with respect to the $2,129,366.00 received by MV LIQUIDITY FUND I, LLC

and/or MV LIQUIDITY FUND, LLC from ARCHIPEL CAPITAL-LATE STAGE FUND, LP,

as well as against all other Defendants as to the monies retained by and/or paid to GRAY,

EDWARDS, ARCHIPEL CAPITAL, LLC, BIM, BENNINGTON, the ARCHIPEL ENTITIES,

KOEPPEL and NIXON PEABODY in connection with the investments made by the Plaintiff in

SOCIAL MEDIA FUND, LP and LATE STAGE FUND, LP.

221.    To compensate the Plaintiff for the amount of monies that were unlawfully

diverted and/or retained by the Defendants for their own benefit, it is necessary for the

Defendants, and each of them, to provide Plaintiff with an accounting of any transfer of funds,

assets or property received by the Defendants, and each of them, from the Plaintiff and/or from

Defendants GRAY, EDWARDS, ARCHIPEL CAPITAL, LLC, BIM, BENNINGTON, THE

ARCHIPEL ENTITIES, MICROVENTURE MARKETPLACE, INC., MV LIQUIDITY FUND,

LLC AND MV LIQUIDITY FUND I, LLC, as the case may be.

**WHEREFORE**, Plaintiff hereby demands judgment as against the defendants herein, and each of them, jointly, severally, and/or otherwise as against all of the Defendants herein as follows:

1.      Compensatory damages in an amount not less than $5,000,000.00;

2.      Consequential damages in an amount not less than $10,000,000.00 as a direct and proximate result of the defendants' breach of contract, and willful or fraudulent activities;

3.      Treble damages as against the defendants pursuant to the Civil RICO violations and other violations of 18 U.S.C. § 1961 et. seq.;

4.      General damages for all injuries resulting from the negligence, fraud, breach of contract and breaches of fiduciary duty committed by the defendants herein, individually, jointly, severally, or together in an amount to be ascertained at the time of trial;

5.      Disgorgement and restitution of all earnings, profits, compensation, and benefits received by the defendants as a result of their unlawful and fraudulent activities and practices;

6.      The imposition of a constructive trust and requirement of an accounting as against each of the Defendants;

7.      Costs and disbursements of this action;

8.      Reasonable attorney's fees incurred with regard to the prosecution of this action, punitive damages for the willful, wanton, and reckless disregard of the rights of the consuming public and the Plaintiff particularly, and as a result of the purposeful fraud that was perpetrated upon the Plaintiff herein, in such fair and reasonable amount as may be determined by the Court or a jury, and such other and further relief as to the Court may seem just and proper including costs and disbursements and interest from the date of transfer of funds.

**DATED:**      December 8, 2015.
              Syracuse, New York

**CHERUNDOLO LAW FIRM, PLLC**


By:  *s/ John C. Cherundolo*

       John C. Cherundolo, Esq.
       Bar Roll No.: 101339

*Attorneys for the Plaintiff*
Office and P.O. Address
AXA Tower I, 17th Floor
100 Madison Street
Syracuse, New York 13202
(315) 449-9500