UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. McESSY,

       Plaintiff

   -v-           1:15-CV-1462

GREGORY W. GRAY, JR.; GREGORY P.
EDWARDS; ARCHIPEL CAPITAL LLC; BIM
MANAGEMENT, LP; and BENNINGTON
INVESTMENT MANAGEMENT, INC.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:       OF COUNSEL:

CHAPMAN, CUTLER LAW FIRM  DAVID THOMAS AUDLEY, ESQ.
Attorneys for plaintiff      JOSEPH LOMBARDO, ESQ.
111 West Monroe       SARA TARANEH GHADIRI, ESQ.
Chicago, Illinois 60603

GREGORY W. GRAY, JR.
Defendant *pro se*
60 School Street #1192
Orchard Park, New York 14127

TARTER KRINSKY & DROGIN LLP  MICHAEL J. GRUDBERG, ESQ.
Attorneys for defendants Edwards
and Bennington Investment
Management, Inc.
1350 Broadway
New York, New York 10018

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## CONTENTS

I. INTRODUCTION ...............................................................................................2

II. BACKGROUND ...............................................................................................3

 A. GRAY MEETS EDWARDS. .........................................................................3

| B. | FUNCTION AND FORM OF THE ARCHIPEL ENTITIES. | 6 |
|---|---|---|
| C. | McESSY MEETS GRAY. | 8 |
| D. | GRAY'S SCHEME IS EXPOSED. | 10 |
| E. | PROCEDURAL HISTORY. | 14 |
| III. | LEGAL STANDARD | 15 |
| A. | DEFAULT JUDGMENT. | 15 |
| B. | SUMMARY JUDGMENT. | 15 |
| IV. | DISCUSSION | 16 |
| A. | PLAINTIFF'S CLAIMS AGAINST ARCHIPEL AND BIM. | 16 |
| B. | VICARIOUS LIABILITY OF EDWARDS, BENNINGTON, AND GRAY. | 23 |
| C. | PLAINTIFF'S CLAIMS AGAINST GRAY. | 29 |
| 1. | SECURITIES FRAUD. | 29 |
| 2. | COMMON LAW FRAUD. | 33 |
| 3. | BREACH OF FIDUCIARY DUTIES. | 34 |
| 4. | SUMMARY. | 35 |
| D. | PLAINTIFF'S CLAIMS AGAINST EDWARDS. | 36 |
| 1. | SECURITIES FRAUD. | 36 |
| 2. | COMMON LAW FRAUD. | 44 |
| 3. | BREACH OF FIDUCIARY DUTY. | 44 |
| 4. | SUMMARY. | 46 |
| E. | PLAINTIFF'S CLAIMS AGAINST BENNINGTON. | 47 |
| F. | DAMAGES. | 48 |
| 1. | BIM AND ARCHIPEL. | 48 |
| 2. | GRAY. | 50 |
| V. | CONCLUSION | 52 |

I.    **INTRODUCTION**

Beginning in 2011 and continuing until 2015, Defendant Gregory W. Gray, Jr. ("Gray" or "American defendant") perpetrated an extensive Ponzi scheme.  We know this, because he pled guilty to charges of securities fraud before the United States District Court for the Southern District of New York on December 23, 2015 for his conduct in managing the

investments of his clients.  What is uncertain is to what extent this conduct opens Gray, his investment companies, and his partner, defendant Gregory P. Edwards ("Edwards" or "Canadian defendant"), to civil liability.

Plaintiff William H. McEssy ("McEssy" or "plaintiff") stands first in line seeking an answer to that question.  Plaintiff invested $5 million into one of Gray's investment partnerships, under the impression that his money would buy him a substantial number of shares in the ride-sharing company Uber.  That impression was mistaken.  Plaintiff now seeks to recover that lost capital, and to that end has sued Gray, Edwards, and the varied legal entities that he alleges were used to further the scheme:  defendants Archipel Capital, LLC ("Archipel"), BIM Management, LP ("BIM") and Bennington Investment Management, Inc. ("Bennington").

Although several claims remain against the other defendants, at present, only three Counts of McEssy's Second Amended Complaint ("SAC") remain against defendants Edwards and Bennington:  (I) securities fraud under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("§ 10(b)"); (V) common law fraud; and (VII) common law breach of fiduciary duty.  Plaintiff has moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56 against Gray, Edwards, and Bennington on those three counts.  Edwards and Bennington have also moved for summary judgment under Rule 56.  Finally, plaintiff has moved for partial default judgment against Archipel and BIM under Rule 55 on the same three counts.

## II.  BACKGROUND

### A.  GRAY MEETS EDWARDS.

In 2006, Gray formed Archipel, a venture capital firm, in Buffalo, New York.  Dkt. 242-3 ("Gray Dep."), pp. 17, 34;[1] Dkt. 242-15, ¶ 5.  At the time, however, he was still an employee

---

[1] Pagination corresponds with CM/ECF.

of Advanced Equities, another financial firm.  *Id.* at 7.  On November 14, 2006, he met Edwards, a Canadian institutional money manager with twenty-seven years of experience, through Advanced Equities.  Dkt. 242-2 ("Edwards Dep."), pp. 4-5, Dkt. 238-9 ("Edwards Dec."), ¶ 2.

Edwards had retired and was working for an Ontario nonprofit designed to facilitate introductions between investors and start-ups.  Edwards Dep. 5.  Gray presented him with a pitch for an investment opportunity over a conference call.  *Id.*  Edwards left the call impressed by the pitch, and the nonprofit invested in the opportunity.  *Id.* at 5-6.

The year 2007 would prove to be a busy one for the two investment professionals.  Edwards organized Bennington in Canada in 2007 so that he could hold a Canadian securities license and provide advice to a venture capital fund.  Edwards Dec. ¶ 9.  Bennington never engaged in any actual business operations, and the Canadian defendant ceded its securities license in 2012.  *Id.*

Meanwhile, over the course of the same year, Gray presented "many investment ideas" to Edwards' nonprofit.  Edwards Dep. 6.  The professional relationship between he and Edwards flourished, and the two engaged in ten venture capital investments without incident until the American defendant's time at Advanced Equity ended in February of 2008.  *Id.* at 6-8; Edwards Dec. ¶ 10.  These investments exceeded $12 million, and the Canadian defendant found the American defendant to be "professional and satisfactory."  Edwards Dec. ¶ 10.  Even after the American defendant left Advanced Equities, he and the Canadian defendant remained in contact because the latter was looking to start a venture capital company in the United States.  Edwards Dep. 9.

As it turned out, however, Gray had not been entirely candid with Edwards.  During 2008, he was being investigated for a series of grievances lodged against him beginning in

2001.  Gray Dep. 34.  On December 17, 2008, while he was still getting Archipel "up and running," the New York Stock Exchange ("NYSE") disciplined him for engaging in unauthorized trades and for threatening customers who complained about those trades—as well as their families.  Gray Dep. 34, 41-59; 242-15, ¶ 4.  As a result, he was barred from association with New York Stock Exchange member firms for three years.  Gray Dep. 42; 242-15, ¶ 4.  The United States Securities and Exchange Commission ("SEC") upheld the censure on July 22, 2009.  Gray Dep. 41.

While the investigative and adjudicative phase of Gray's NYSE discipline continued, the charges' existence came to Edwards' attention.  Edwards Dep. 7.  On November 5, 2008, he sent the American defendant an email telling him that "[n]ot disclosing [his] securities exchange issues [to the Canadian defendant] and the reasons [he was] fired from [Advanced Equities] shows [his] true character" and calling him "[p]athetic."  *Id.* at 135.  Nevertheless, he reviewed the charges, and decided that because they lacked any "mentions of fraud," he would stay the course and maintain his relationship with the American defendant.  *Id.* at 8.

In 2009, Gray reached out to Edwards and explained that he had left Advanced Equities to pursue his own investment company:  Archipel, a limited partnership.  Edwards Dep. 6-8.  Engaged as he was in a new enterprise, he asked the Canadian defendant if he would participate on Archipel's advisory board.  *Id.* at 6-7.  On November 18, 2009, the Canadian defendant provided a $75,000 loan to Archipel, solidifying their business relationship.  *Id.* at 11.

As a result of that loan, Gray and Edwards possessed a sixty-five and twenty-five percent ownership stake in Archipel respectively.[2]  *See* Edwards Dep. 162, Dkt. 242-15, ¶ 5.  They also owned the same respective percentages of BIM, a limited partnership that they

---

[2] The remaining ten percent ownership stake belonged to one Tony Oram, who does not meaningfully enter into this case.  Edwards Dep. 162.

formed to carry out their investment business.  Dkt. 242-15, ¶ 6.  Both defendants were general partners of BIM when it was first created in Delaware on May 10, 2011.  Edwards Dep. 170-171.

## B. FUNCTION AND FORM OF THE ARCHIPEL ENTITIES.

Having established who was operating Archipel, some explanation is necessary to clarify how Gray solicited and managed investments.  When he would identify a company that he thought ripe for investment, he would form a new limited partnership.  Dkt. 242-15, ¶ 18. These partnerships included:  Archipel Capital-Agrivida LLC; Archipel Capital-Amyris Biotechnologies LP; Bennington Everloop LLP; Lineagen LP; Archipel Capital Bloom Energy LP; Archipel Social Media LP; Archipel Capital Late Stage LP ("Late Stage"); and four different Archipel Capital-Social Media Funds (together "the Archipel entities").  Dkt. 242-15, ¶¶ 7-16.

BIM is itself the general partner to each of those partnerships, and it was intended to manage the investment opportunities of each of the Archipel entities.  *See, e.g.*, Dkt. 242-8, p. 11.  Gray formed a new entity for each company in which he sought to invest.  Dkt. 242-15, ¶¶ 17-18.  The investors would then buy ownership stakes in the Archipel entity or entities associated with a company that they thought presented a promising investment.  *Id.* ¶ 18.  In so doing, each investor became a limited partner to that Archipel entity.  *Id.*

The Archipel entities would use the resulting funds from the purchased ownership stakes to purchase stock in companies before that stock went public, or else if it was believed those companies would soon experience a "liquidity event," such as a merger or an acquisition, increasing their value.  Dkt. 242-15, ¶ 17.  Thus, though the Archipel entities held the stock, rather than the investors, the investors would have an ownership stake in the entity and would stand to profit off of that ownership stake when the entity sold the stock.  BIM took

a five percent cut of all capital raised by the entities as a "management fee," a maximum of another five percent to cover expenses to manage the funds, and ten percent of the profits resulting from the stock's sale above the amount needed to repay the investors.  Edwards Dep. 184.

As for Edwards' role, the record reflects some tension between the expectation and the reality.  His name and biography are listed prominently—indeed, first of all—in the Private Placement Memoranda ("PPMs"), documents used to appraise investors of the benefits and risks of investing in an Archipel entity.  Edwards Dep. 179, 187.  The PPMs go on to describe his extensive history in the investment world since his founding a capital management company in 1983.  *Id.* at 187.  They also noted that the company he founded "managed $15 billion in assets for pension funds, financial institutions, foundations and 'high net worth' investors."  *Id.*

The PPMs state that both individual defendants in this case would "manage [BIM] and oversee its operations[.]"  Edwards Dep. 187.  Conspicuously absent from the same documents were any reference to Gray's disciplinary history.  *Id.* at 187.  On the contrary, the documents listed his credentials as if they were still intact.[3]  *Id.*  Edwards declares that he had discussed including the American defendant's disciplinary history in the PPMs but deferred to the expertise of the lawyers that drafted the documents.  Edwards Dec. ¶¶ 16-18.

In addition to the PPMs listing Edwards as a manager of BIM, Gray also had a habit of referring to Edwards around investors as the "Chairman of the Board."  Gray Dep. 15.  However, he stated in his deposition that to his knowledge his counterpart "was unaware [he had given] him the chairman of the board status[.]"  *Id.*

---

[3] The Late Stage PPM, however, issued in May of 2014, rephrases Gray's qualifications to state only that he passed the tests to receive them, and specifically notes his prior securities violation as an investment risk factor. Gray Dep. pp. 246, 254, 256.

As to the division of responsibilities between the two defendants, Gray had the more active role in carrying out the daily operations of the varied partnerships, while Edwards functioned as a mentor, or, as the American defendant termed it, a "godfather." Dkt. 242-4, p. 4. However, the Canadian defendant has declared that he never managed the operations of the Archipel entities, and he only visited the offices in Buffalo "approximately four times over four years." Edwards Dec. ¶ 13. Nevertheless, both were the only two people who "were the ultimate decision-makers" for the Archipel entities. Dkt. 242-8, p. 5.

## C. McESSY MEETS GRAY.

The Archipel entities began seeking investors in earnest in 2011. Dkt. 242-15, ¶ 17. They would find McEssy, their biggest investor, in Lake Forest, Illinois. Dkt. 238-2 ("Plaintiff Dep."),[4] p. 8. In October of 2012, a longtime friend of plaintiff's brought one of the Archipel entities to his attention. *Id.* at 16, 18-19, 26. Sometime later, likely in 2013, plaintiff met Gray at plaintiff's office to discuss the potential of purchasing stock through that entity. *Id.* at 20, 28.

On November 19, 2012, McEssy bought $200,000 of stock in a company called Bloom Energy ("Bloom") through an Archipel entity. Dkt. 242-16, p. 2. In March of 2013, Gray presented plaintiff with another Archipel entity and its corresponding investment opportunity: the social media company Twitter. Dkt. 238-3 ("Hall Dep."),[5] p. 26. The parties met on April 4, 2013, to discuss the opportunity. *Id.* at 27. The American defendant had indicated to plaintiff and his financial advisor, John Hall ("Hall"), that it would be incredibly difficult to attain Twitter shares. *Id.* at 33. As a result, and given the scope of plaintiff's planned million dollar investment, Hall wanted verification that the American defendant could follow through on his

---

[4] Both parties provide their own sets of excerpts from plaintiff's deposition testimony. Because defendants' excerpts are more inclusive, citations to Plaintiff Dep. will refer to this docket entry.
[5] Similarly, both parties provide their own excerpts from the deposition of plaintiff's financial advisor, John Hall. Again, because defendants' excerpts are more complete, citations to Hall Dep. will refer to this docket entry.

promise.  *Id.*  On April 8, 2013, the American defendant provided proof of an Archipel entity's ownership of the Twitter shares.  Dkt. 242-6, pp. 36-37.

Not long afterward, Hall discovered Gray's checkered disciplinary history.  Hall Dep. 28.  As a result, the American defendant returned to McEssy's office for another meeting to explain his disciplinary record.  *Id.*; Plaintiff Dep. 38-39.  He then told plaintiff and Hall his narrative concerning the disciplinary charges:  he had simply gotten into an argument with a client.  Plaintiff Dep. 38.  Between this explanation and—plaintiff alleges—Edwards' support, plaintiff was satisfied and continued investing through the Archipel entities.  *Id.* at 39, 44.  Plaintiff conducted no further inquiries into the American defendant's disciplinary history.  *Id.* at 40.  Plaintiff has testified, however, that had he known the full extent of that disciplinary record, he would have fired both defendants.  *Id.* at 44.

It was not until November of 2013 that McEssy met Edwards in connection with another Archipel investment opportunity in the company Lineagen.  Plaintiff Dep. 20, 31, 33; Hall Dep. 34.  Plaintiff believed that the Canadian defendant and Gray were partners, and that both would manage and direct the Archipel entities.  Plaintiff Dep. 20.  In fact, the American defendant introduced his counterpart as his partner and Archipel's chairman.  Hall Dep. 36.  According to Hall, the Canadian defendant himself underscored both of those points.  *Id.*  The Canadian defendant also seemed unconcerned by his counterpart's disciplinary history and explained that the discipline was "frivolous."  Plaintiff Dep. 41.

McEssy had not met Edwards before investing in either Bloom or Twitter.  Plaintiff Dep. 33.  In his deposition, however, he testified that the Canadian defendant confirmed the quality of these investments when they did meet and discussed the possibilities presented by future investments.  *Id.*  Moreover, plaintiff stated that he felt that the Canadian defendant was "a person [he] could rely on" and noted that "the fact that he was going to be the general

partner and the managing partner made [plaintiff] feel comfortable." *Id.* at 58. The Canadian defendant further left plaintiff and Hall with the impression that he exercised control over the investments because he displayed a strong knowledge base regarding the investment in Lineagen. Hall Dep. 36.

On April 21, 2014, Gray emailed Hall advising him and McEssy of the possibility of investing in the rideshare company Uber. Hall Dep. 37. On May 20, 2014, Gray, Edwards, McEssy, and Hall met at plaintiff's office to discuss that investment opportunity. *Id.* at 37-38. The American defendant represented to plaintiff that he had an allocation of $5 million in Uber shares that were available for purchase. *Id.* at 39.

The same day of the meeting, Edwards sent Hall and McEssy an email containing an article expounding the value of Uber. Dkt. 242-6, p. 43. On June 10, 2014, plaintiff purchased the entirety of the purported stock, and became the only investor in Late Stage, an Archipel entity created for this transaction. Hall Dep. 40; Dkt. 242-15, ¶ 30; *see generally* Gray Dep. pp. 246-295. Plaintiff stated at his deposition that he felt "perfectly safe with Uber" when the Canadian defendant said that he would have liked to have also invested in the stock prior to plaintiff's buying it all. Plaintiff Dep. 61.

McEssy was cautious nevertheless, and as part of the agreement, if defendants failed to procure the stock within twenty-one days, he was entitled to his money back. Plaintiff Dep. 81; Dkt. 242-6, p. 48-50. Gray never provided the stock, and so plaintiff requested a refund. Plaintiff Dep. 96. The American defendant did not provide that refund despite plaintiff's repeated requests. *Id.* However, plaintiff never contacted Edwards to inquire about the absent stock. *Id.* at 97.

**D.  <u>GRAY'S SCHEME IS EXPOSED.</u>**

The requested refund proved to be as illuminating—and destructive—as lightning in a droughted forest. Of course, Gray did not have the money McEssy had given him. After all, of the various Archipel entities and their corresponding investment opportunities, Twitter alone had given any semblance of a positive return on the investment. Dkt. 242-15, ¶ 21.

As a result, Gray had diverted investment funds from the Twitter account to pad the accounts of the other investments and create the illusion of more universal success. Dkt. 242-15, ¶ 23. When more Twitter shares became available, he diverted the funds back from the other accounts to purchase the additional shares. *Id.* All told, the Archipel Twitter fund had raised a total of $5,240,092.49 to purchase shares of Twitter, but because of the diversion of those funds, he only actually purchased $1,875,000 worth of shares. *Id.* ¶ 26. Despite the staggering, nearly-$3,500,000 difference between the funds raised and funds used, less than $100,000 remained in the Twitter account. *Id.* ¶ 27.

On June 19, 2014, BIM amended its certificate of limited partnership so that Edwards was no longer a general partner. Edwards Dep. 226-27. It is unclear, however, whether he was aware that this amendment had taken place. Dkt. 256-1, p. 39.[6]

That same day, Gray began lying about paperwork delays to further the illusion that the account held what it had promised. Dkt. 242-15, ¶¶ 28-29. Cornered and desperate, he launched one final scheme to attempt to cover the massive difference in available funds and shares for the Twitter account. *Id.* ¶ 30.

Gray invented Late Stage, lied about possessing an allocation of Uber stock, and asked investors for enough funds to cover his debts on the Twitter account. Dkt. 242-15,

---

[6] Plaintiff submits this evidence for the first time with his reply. Dkt. 256-1, p. 39. However, because this evidence consists of Edwards' deposition testimony—at which both he and his counsel were of course present—this Court may nevertheless consider it. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 53 (2d Cir. 1996) (noting that district court may consider new evidence submitted with a reply where the opposing party "was fully aware prior to the defendants' reply of" the issue to which the evidence pertained).

¶ 30. McEssy believed him and bought the "stock," but the American defendant never bought Uber shares. *Id.* ¶¶ 30, 32.

Instead, Gray used McEssy's money to buy out the Twitter investors who wanted to wash their hands of the venture and buy stock in Twitter to provide shares for those who wanted to remain. Dkt. 242-15, ¶ 32. On August 4, 2014, plaintiff requested proof of his ownership of Uber stock. Dkt. 242-6, pp. 70-71. On August 8, 2014, the American defendant forged an executed sales agreement for that stock. *Id.* at 72-75; Dkt. 242-15, ¶ 35.

Gray admitted at his deposition that the entire Uber transaction "was a fraud that [he] created by [him]self, trying to buy [him]self time" to cover for the fallout of the Twitter comingling. Gray Dep. 26. He claims he acted alone in orchestrating this scheme. *Id.* 22.

Meanwhile, the investors in Twitter increasingly started to voice concerns, which Gray dismissed as "crazy." Edwards Dep. 153. Edwards urged him not to respond. *Id.* On June 13, 2014, Archipel's Twitter investors complained to the SEC about the discrepancies in the Twitter shares. Edwards Dep. 160.

In December of 2014, McEssy received a phone call from the SEC explaining that they were investigating Gray and Archipel based on allegations of securities fraud arising from his comingling funds. Plaintiff Dep. 107, Dkt. 242-6, p. 76. They informed plaintiff that he might be the victim of a Ponzi scheme. Plaintiff Dep. 108. However, in a follow-up email concerning the pending investigation, the SEC noted that "[t]he existence of this investigation should not be construed as an indication by the [SEC] or its staff that any violation of law has occurred, nor as a reflection upon any person, entity, or security." Dkt. 242-6, p. 76.

In February of 2015, Edwards also began to grow suspicious of Gray when the latter suddenly pivoted from his plans of maintaining the Uber stock and stated that he was planning on instead investing in Uber's competitor, Lyft. Edwards Dep. 39. As a result, on

February 3, 2015, the Canadian defendant asked the American defendant for a copy of the certification email for the Uber transaction that the American had sent Hall on August 8, 2014. Gray Dep. 358.

Meanwhile, McEssy continued to employ Gray throughout the investigation. *See* Plaintiff Dep. 112. Plaintiff based this decision in part on the American defendant's representation that an investigatory meeting with the SEC on February 24, 2015 "went well." *Id.*; Dkt. 242-4, p. 2.

The truth, of course, was that this meeting went far short of "well." Instead, Gray's responses to the SEC's questions involved a series of falsehoods. As a result, the SEC turned its information on him over to the United States Attorney's Office for the Southern District of New York, and charges were brought against him for perjury and securities fraud for the extended scheme involving Twitter and Uber. *United States v. Gray*, 1:15-CR-297, Dkt. 1 (S.D.N.Y. Mar. 4, 2015).

During the entire timeframe between May 20, 2014, and February 2015, McEssy never tried to contact Edwards concerning his Uber stock. Plaintiff Dep. 65. Overall, plaintiff met the Canadian defendant "three, possibly four times." *Id.* at 62. He also "never had any personal contact with [the Canadian defendant] [him]self by mail or phone." *Id.* at 56.

For his part, Edwards never took a "harder look" at the Archipel entities' records, even after an SEC press release informed him of the allegations of fraud against Gray. Edwards Dep. 73-74. Neither did he investigate whether the American defendant's explanations for the delayed Twitter payouts were truthful. Edwards Dep. 54. He also claims that he did not doubt the veracity of the American defendant's ability to procure the Uber stock, and in fact asked to be included in the purchase. Edwards Dep. 146.

As noted, on December 23, 2015, Gray pled guilty to the charges of perjury and securities fraud brought against him.[7] Dkt. 242-22, pp. 8-12. His narrative of the acts underlying the guilty plea specifically describe his soliciting a $5 million investment in Uber shares from an investor, which he instead used to pay off the Twitter investors for the shares that he "had promised but was ultimately unable to obtain." *Id.* at 17. For these crimes, he was sentenced to twenty-four months' imprisonment. *Gray*, 1:15-CR-297, Dkt. 56 (S.D.N.Y. Oct. 26, 2016).

## E. <u>PROCEDURAL HISTORY.</u>

On December 9, 2015, McEssy filed a complaint in this District. Dkt. 1. On December 18, 2017, plaintiff filed the SAC, which is the current operative pleading. Dkt. 145. Defendants Archipel and BIM never responded to the SAC, nor have they otherwise appeared with representation. Despite the SAC's inclusion of several causes of action, after this Court's August 11, 2016 Memorandum-Decision and Order, plaintiff's only remaining claims against Edwards and Bennington are Counts: (I) a § 10(b) securities fraud claim; (V) a common law fraud claim; and (VII) a claim for breach of fiduciary duty. Dkt. 69, p. 36. However, Counts II-IV, VI, and VIII-XV against all other defendants remain active.

On February 1, 2017, McEssy obtained an entry of default against defendants Archipel and BIM. Dkt. 113. On October 16, 2019, plaintiff, Edwards, and Bennington moved for summary judgment against each other on the three remaining claims in Counts I, V, and VII of the SAC. Dkts. 238, 240. Plaintiff also has moved for summary judgment on Counts I, V, and VII against Gray. Dkt. 241. Lastly, plaintiff moved for partial default judgment against defendants Archipel and BIM for the same counts for which he moved for summary judgment

---

[7] As plaintiff correctly notes, this Court may take judicial notice of plaintiff's guilty plea because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *United States v. Kelly*, 368 F. App'x 194, 199 (2d Cir. 2010) (citing FED. R. EVID. 201(b)(2)) (taking judicial notice of guilty plea).

14

against the other defendants.  Dkt. 244.  The parties' motions having been fully briefed, this Court will now consider the motions on the basis of the parties' submissions without oral argument.

III.  **LEGAL STANDARD**

A.  **DEFAULT JUDGMENT.**

Under Rule 55, a district court may grant default judgment against a party for the failure to plead or otherwise defend an action.  FED. R. CIV. P. 55; *see Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  A party moving for default judgment must first attain an Entry of Default from the Clerk of the Court.  FED. R. CIV. P. 55(a).  Once the party attains an entry of default, they must serve the defendant with written notice of the application for default judgment under Rule 55(b)(2).  Once default has been established as proper, the party moving for default is "entitled to all reasonable inferences from the evidence offered," but a district court still must determine whether the allegations establish liability as a matter of law.  *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

B.  **SUMMARY JUDGMENT.**

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## IV.    DISCUSSION

Again, McEssy has moved for default judgment against Archipel and BIM on Counts I, V, and VII of the SAC. He has also moved for summary judgment against Gray on the same three Counts. Lastly, he has moved for summary judgment on those Counts, which alone remain against Edwards and Bennington. For their part, those parties have similarly moved for summary judgment in their favor and for dismissal of the case against them.

### A. PLAINTIFF'S CLAIMS AGAINST ARCHIPEL AND BIM.

McEssy has moved for default judgment against Archipel and BIM on three claims: (I) securities fraud under § 10(b); (V) common law fraud; and (VII) breach of fiduciary duty.

A "corporation may appear in the federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993). Therefore, "where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55[.]" *SEC v. Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975); *accord Jacobs v. Patent Enf't Fund, Inc.*, 230 F.3d 565, 568 (2d Cir. 2000). The same prohibition extends to partnerships. *Leviton Mfg. Co., Inc. v. Fastmac Performance Upgrades, Inc.*, 2013 WL 4780045, at *2 (S.D.N.Y. July 8, 2013) (citing *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983)).

McEssy has attained an Entry of Default and has served Gray—the primary shareholder in Archipel and BIM—and Edwards' counsel with notice of the application for default.  Dkt. 113; 244-4.  Archipel and BIM are both legal entities, and thus their failure to appear at this late stage with representation by counsel—and their continued failure to answer the complaint—constitute a default.  Dkt. 112; *Jacobs*, 230 F.3d at 568.  However, this Court must yet determine whether plaintiff has asserted allegations that plausibly establish liability as a matter of law.

Under New York's choice of law rules, "the liability of partners of an out-of-state partnership [are judged] according to the laws of the jurisdiction where the partnership was organized."  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 485 (S.D.N.Y. 1996).  Thus, because BIM was formed in Delaware, Delaware law applies.[8] Edwards Dep. 170-71.

Under Delaware law, a partnership is liable for the loss or injury caused to a third party as a result of a wrongful act or omission by a partner within the course of partnership business.  6 DEL. C. § 15-305.  Gray and Edwards are partners to BIM, and thus BIM is liable for acts pleaded against them.  Dkt. 242-9, p. 3; Edwards Dep. 171.

However, the same is not true of limited liability companies such as Archipel.  First, because Archipel was formed in New York, this state's law governs this issue.  *See* Dkt. 242-15, ¶ 5.  To attribute the tortious acts of a member to a limited liability company under the law of that state, parties must establish the "reverse" variant of the legal principle of piercing the corporate veil.  *Monteleone v. Leverage Grp.*, 2008 WL 4541124, at *9 (E.D.N.Y. Oct. 7, 2008) (applying reverse piercing the corporate veil to attribute liability for controller to

---

[8] Alternatively, the partnership agreement between each Archipel entity and BIM includes a choice of laws provision stating that the agreement will be construed according to Delaware law.  *See, e.g.*, Gray Dep. 188, 286.  Because the outcome is the same either way, this Court need not decide whether it is bound to follow that clause.

limited liability company).  Nowhere has McEssy made any allegations allowing for the collapse of the distinction between Archipel on the one hand, and Gray and Edwards on the other.  *See generally* Dkt. 145 ("SAC").  Thus, plaintiff must properly allege that Archipel itself acted to harm him.

Upon review, the pleadings are sufficient to merit relief on each of the three counts alleged against BIM:  (I) § 10(b) securities fraud; (V) common law fraud; and (VII) breach of fiduciary duty.  The elements of a private securities fraud claim under § 10(b) are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

McEssy has plausibly alleged that Gray perpetrated through BIM a "Ponzi-like" scheme that asked for $5 million to invest in Uber stock that never existed to cover losses in other investments.  SAC ¶¶ 5-6, 76-78.  The claims are not merely plausible; the entire record demonstrates that they are true.  These allegations establish a material misrepresentation of the existence of available Uber stock, knowledge at least by the American defendant that no such stock was ever available, and that the misrepresentation concerned a false purchase of stock, thus alleging each of the first three elements of § 10(b) securities fraud.  *Matrixx*, 563 U.S. at 37-38.

Moreover, McEssy plausibly alleges a $5 million loss caused immediately and directly by his trusting that the investment existed.  SAC ¶ 111.  Accordingly, plaintiff has alleged every necessary element of Count I, § 10(b) securities fraud against BIM.  *Matrixx*, 563 U.S. at 37-38.

As for Archipel, McEssy has plausibly alleged that this entity defendant assisted in the American defendant's scheme and was necessary to its completion.  SAC ¶ 110. Specifically, he alleges that Archipel sent sham confirmations of stock purchases to aid in Gray's scheme.  *Id.*  These allegations are sufficient to attribute liability to this organizational defendant.  Therefore, plaintiff has plausibly alleged every necessary element of Count I, § 10(b) securities fraud against this defendant as well.

Regarding plaintiff's Count V common law fraud claim, a district court hearing state common law claims is bound to apply the choice-of-law rules of the state in which that court sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In New York, courts must apply an "interest analysis" test to determine which state's laws should be used. *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006). Therefore, "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  *Id.* (alterations in original) (citing *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)).

"Two separate inquiries are . . . required to determine the greater interest:  (1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss."  *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994) (internal citations omitted).  If the tort in question is one that regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013).

Both inquiries favor applying Illinois law. First, BIM and Archipel are entities formed under Delaware and New York law, respectively. Edwards Dep. 170-71; Dkt. 242-15, ¶ 5. By contrast, McEssy lives in Illinois, and most of his meetings with defendants took place in that state. Plaintiff Dep. 8, 28; Edwards Dec. ¶ 13. The relevant contacts are thus either evenly split between the two states or else favor Illinois. *Padula*, 644 N.E.2d at 1002. However, because plaintiff's interactions with all defendants primarily took place in Illinois and especially because the fraudulent discussions concerning Uber took place in Illinois, that state is the jurisdiction where the tort occurred, and because fraud is a conduct-regulating tort, Illinois law applies.[9] *In re Thelen*, 736 F.3d at 220.

Under Illinois law, a plaintiff must prove five elements to establish common law fraud: (1) a false statement of material fact; (2) known or believed by its maker to be false; (3) intent to cause the plaintiff to act; (4) reliance; and (5) plaintiff's reliance caused his injury. *Fifth Third Mortgage Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019).

McEssy has sufficiently alleged Count V, common law fraud, against BIM. He alleges that Gray and Edwards misled him as to the former's credentials and disciplinary history, and that but for these misrepresentations, he would not have invested in any Archipel entity. SAC ¶¶ 159-63. Whether an investor that a plaintiff seeks to trust with their money is licensed or has been disciplined in the past for commingling funds is plausibly material information that plaintiff has alleged both individual defendants knew, as by extension did BIM.

McEssy has also plausibly alleged that he relied on the documentation that BIM provided him establishing the American defendant's disciplinary record. SAC ¶ 164. Similarly, plaintiff has more than adequately established that damages resulted in the form of the money that he paid to Gray for the varied failed investments. *Id.* ¶ 183. Thus, plaintiff

---

[9] The same analysis requires the use of Illinois law in assessing the individual defendants' claims as discussed below.

has also plausibly alleged fraud and merits default judgment on that count. Similarly, Archipel's aiding and abetting the American defendant's scheme similarly plausibly exposes it to liability. SAC ¶ 109.

Lastly, to state a claim for Count VII, breach of fiduciary duties, under Illinois[10] law, a plaintiff must establish: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that the breach proximately caused the plaintiff's complained injury. *In re Odeh*, 431 B.R. 807, 812 (N.D. Ill. 2010) (citing *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)).

McEssy has plausibly alleged a fiduciary relationship between himself and BIM based on the large amount of his money that he trusted to Gray and Edwards. SAC ¶¶ 182-83. That plaintiff has plausibly alleged that Gray in particular, and by extension BIM, committed misconduct for the pattern of activity demonstrated throughout this case is too obvious to require even minor scrutiny. Finally, that the misconduct caused damages by compelling plaintiff's investments in the varied Archipel entities is also clear. Thus, he has plausibly alleged that BIM breached a fiduciary duty through the individual defendants.

However, he has failed to allege anywhere that Archipel itself owed him a fiduciary duty. Nor has he made allegations suggesting such a relationship with Archipel itself, which functioned primarily as a "brand" used to attract investors. SAC ¶ 21. He therefore cannot attain summary judgment against that defendant.

Accordingly, McEssy merits default judgment against BIM for each claim for which he requests it. He only merits default judgment against Archipel, however, for his claims under Count I, § 10(b) fraud and Count V, common law fraud, because he has failed to plausibly

---

[10] The same choice of law analysis discussed above requires that this Court apply Illinois law. *See, e.g.*, *Koury v. Xcellence, Inc.*, 649 F. Supp. 2d 127, 135 (S.D.N.Y. 2009) ("In New York, claims for breach of fiduciary duty are analyzed under choice of law principles applicable to torts." (internal quotation marks and citations omitted)).

allege that Archipel owed him a fiduciary duty to satisfy Count VII. Because his complaint has failed on its face to plausibly allege a legitimate cause of action for Count VII, plaintiff is hereby ordered to show cause why this Court should not grant summary judgment in Archipel's favor under Rule 56(f)(1).

Additionally, despite this Court's grant of default judgment against BIM for Counts I, V, and VII, and against Archipel for Counts I and V, plaintiff still has several remaining counts in the SAC for which plaintiff has not moved for judgment. These include Counts: (II) for Control Person Liability under § 20(a) of the Securities and Exchange Act of 1934; (III) for a violation of § 12 of the Securities Act of 1933; (IV) for a civil Racketeering Influenced and Corrupt Organizations Act violation under 18 U.S.C. § 1962; (VI) for breach of contract; (VIII) for conversion; (IX) for unjust enrichment; (X) for a violation of N.Y. GEN. BUS. LAW § 349; (XI-XIV) for violations of N.Y. DEBT. & CRED. LAW §§ 273-76; and (XV) for constructive trust and accounting.

Given the lack of momentum on these Counts, this Court orders McEssy to show cause why these Counts should not be dismissed against both BIM and Archipel for failure to prosecute under Rule 41(b). There are five relevant factors for dismissal for failure to prosecute:

> (1) . . . plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the [adequate assessment of] the efficacy of lesser sanctions.

*Lewis v. Rawson*, 564 F.3d 569, 576 (2d Cir. 2009).

To the best of this Court's knowledge, McEssy has done precious little with this panoply of claims since they were levied, and certainly since this Court dismissed each of them against Edwards and Bennington in its August 11, 2016 order. *McEssy v. Gray*, 2016

WL 10518458 (N.D.N.Y. Aug. 11, 2016). This has resulted in three years of inaction and unnecessary complication to an already complicated case. Especially now that this Court will begin to contemplate trial, this case must be pared down into some semblance of a manageable form.

Because McEssy has already attained the right to recover against Archipel and BIM for the same conduct that supports these varied other claims, and also because the legal viability of those claims is called rather seriously into question by this Court's August 11 order, this Court orders plaintiff to demonstrate why these claims should continue to linger untended and of dubious merit as they have for the past three years. *McEssy*, 2016 WL 10518458. Should he fail to do so, or to stipulate to their dismissal himself, this Court will see them dismissed to move toward the resolution of this case.

### B. <u>VICARIOUS LIABILITY OF EDWARDS, BENNINGTON, AND GRAY.</u>

McEssy argues that BIM's wrongdoing is attributable to Edwards, because he is a general partner of BIM. He also argues that Gray is vicariously liable for the other individual defendant's misconduct, although he curiously fails to argue for the attribution of BIM's liability to the American defendant.

Under Delaware law, partnerships come in two forms: general partnerships and limited partnerships. *See In re Adelphia Commc'ns Corp.*, 376 B.R. 87, 93 (S.D.N.Y. 2007) (citing *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391 (D. Del. 2000)). In a general partnership, "all partners are personally liable for all of the obligations of their partnership." *In re Adelphia*, 376 B.R. at 93. This is because "partners in general partnerships are unlikely to be passive investors who profit solely on the efforts of others." *Id.* (citing *Great Lakes Chem. Corp.*, 96 F. Supp. 2d at 391).

Limited partnerships, however, are composed of both general partners and limited partners. *In re Adelphia*, 376 B.R. at 93 (citing *Great Lakes Chem. Corp.*, 96 F. Supp. 2d at 391). "General partners in limited partnerships have all the powers and duties of general partners in general partnerships, and are liable for the debts of the partnership." *Great Lakes Chem. Corp.*, 96 F. Supp. 2d at 391. Limited partners, by contrast, are treated as passive investors, and their partnership is treated as a security. *Id.* (citing 6 DEL. C. § 17-403(b)).

Curiously, the extent of partnership liability under Delaware law appears to be something of a mystery. It is beyond dispute that "general partners are personally liable for partnership obligations but limited partners are not." *In re LJM2 Co-Inv., L.P.*, 866 A.2d 762, 772 (Del. Ch. 2004). But Delaware courts are oddly silent as to what precisely "partnership obligations" mean, and whether they reach tort liability. The parties to this action have provided little support resting on principles of Delaware law to help this Court find clarity. For its part, this Court has scoured that state's case law but been consistently unsuccessful at finding any semblance of a clear answer.

For instance, *Folk on the Delaware General Corporation Law*, one of—if not the— foremost treatises on Delaware business law, illuminates little about whether the tort liability of one general partner or the partnership itself attaches to every general partner. 4 Robert S. Saunders, Allison L. Land & Jennifer C. Voss, *Folk on the Delaware General Corporation Law*, § 17-403.04 (6th Ed. 2014). Instead, that text and the cases that it cites speak only in terms of joint and several obligation for the partnership's debts. *Id.* (citing *Transpac Drilling Venture, 1983-63 by Crestwood Hosps., Inc. v. United States*, 16 F.3d 383, 388 n.5 (Fed. Cir. 1994), *cert denied*, 513 U.S. 819 (1994); *In re LJM2*, 866 A.2d at 772).

Indeed, the only cases that *Folk* cites touching upon tort liability stand for the principle that under the Federal Debt Collection Practices Act, general partners were held vicariously

liable for the partnership's debt collection activities.  *Folk*, § 17-403.04 (citing *Randle v. GC Servs., L.P.*, 25 F. Supp. 2d 849, 851-52 (N.D. Ill. 1998); *Peters v. AT&T Corp.*, 179 F.R.D. 564, 568-69 (N.D. Ill. 1998)).

However, even those cases were decided before July 11, 1999, the date on which the most recent version of Delaware's Uniform Partnership Law took effect.  *Folk*, § 17-403.04. That law changed the language of Delaware's partnership statute such that no longer would a general partner be "[j]ointly and severally [liable] for *everything chargeable* to the partnership," *Peters v. AT&T Corp.*, 43 F. Supp. 2d 926, 930 (N.D. Ill. 1999)[11] (emphasis added) (citing 6 DEL. C. § 1515(a)), but instead would be liable for "*all obligations of the partnership*," 6 DEL. C. § 15-306(a) (emphasis added).

The language of the latter statute seems to be narrower, and in fact seems to exclude tort liability itself, which could be "chargeable" to a partnership, by limiting liability to the monetary obligations of the partnership.  *Compare* 6 DEL. C. § 15-306(a), *with* 6 DEL. C. § 1515(a).  It thus appears on a comparative reading of the changes made to Delaware's partnership statutes in 1999 that the legislature of that state made a conscious choice not to include the precise form of liability that plaintiff calls for.

This inference only grows stronger when 6 DEL. C. § 15-306 is compared to the statute obligating the partnership itself for the misconduct of its partners, 6 DEL. C. § 15-305.  The latter statute expressly allows for the imputation of a partner's liability to the partnership for "loss or injury caused to a person . . . as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership . . . ."  6 DEL. C. § 15-305.  The absence of the same language in 6 DEL. C.

[11] This later iteration of the *Peters* case was decided on March 30, 1999, months before Delaware's Uniform Partnership Law took effect.  *See Folk*, § 17-403.4.

§ 15-306 cuts strongly against imputing tort liability on partners for the partnership's actionable misconduct.

Justifiably, given the lack of any clear answers on the subject of whether a general partner under Delaware's legal scheme is liable in tort for the acts of his partners, McEssy relies largely on the District of Delaware's case *In re Phillips Petroleum Sec. Litig.*, 738 F. Supp. 825, 837 (D. Del. 1990). That case lays out the typical principles of partnership law: (1) "under the law of partnerships, knowledge and actions of one partner are imputed to all others[;]" and (2) a general partner's liability "extends to any acts or omissions which occurred while [he was] a partner." *Id.* "Thus, the fraudulent misrepresentations of one partner in the course of partnership business will be imputed to all other partners." *Id.* at 837-38.

However, setting aside that the case was decided before Delaware's Uniform Partnership Law took effect in 1999, the District of Delaware in *Phillips* cites nothing to support the proposition that all knowledge and actions—including fraudulent misrepresentations—are attributable to every partner in a Delaware partnership. *See* 738 F. Supp. at 837.

In fact, the paragraph of that case containing that language relies entirely on *Engl v. Berg*, a case out of the Eastern District of Pennsylvania. 511 F. Supp. 1146, 1154 (E.D. Pa. 1981). But *Engl* says nothing at all about Delaware partnership law. Instead, it discusses a Pennsylvania statute, the now-repealed 59 Pa. C.S.A. §§ 311(b) and 324. *Id.* The general partnership liability component of this Pennsylvania statute expressly states that:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

59 P<span style="font-variant: small-caps;">a.</span> C.S.A. § 324.

Similarly, New York's general partnership statutes, which plaintiff relies on by way of analogy, expressly note that all general partners are jointly and severally liable for torts committed by their partners within the scope of partnership business. N.Y. P'ship Law §§ 24 (imputing to partnership liability for "any wrongful act or omission of any partner"), 26(a)(1) (imputing joint and several liability to all partners for "everything chargeable to the partnership" under § 24).

Neither McEssy's indirect citation to Pennsylvania law nor his analogy based on New York Law are persuasive. As plaintiff himself notes, the liability that he alleges against Edwards "is grounded in . . . Delaware partnership statutes . . . ." But there is simply no language in Delaware's modern statutory partnership scheme that allows for the imputation of tort liability against all general partners. *Compare* D<span style="font-variant: small-caps;">el.</span> C. § 15-306(a) (holding partners liable for "all obligations of the partnership"), *with* N.Y. P'<span style="font-variant: small-caps;">ship</span> L<span style="font-variant: small-caps;">aw</span> § 24 (holding partners liable for "any act or omission of any partner"), *and* 59 P<span style="font-variant: small-caps;">a.</span> C.S.A. § 311(b) (establishing that knowledge of each partner is imputed to every other partner). Thus, a partner's actions create a binding obligation on the partnership as a whole, but nothing establishes a system of imputing tort liability on other partners. *See* D<span style="font-variant: small-caps;">el.</span> C. § 15-306(a); *Folk*, § 17-403.04.

Even including cases, there is no font of Delaware law after 1999 that has ever allowed for imputing liability to all general partners in the manner that plaintiff suggests. This Court is unwilling to assume that Delaware law contemplates this extreme outcome on the basis of one unsupported sentence, in one paragraph, with no citations to Delaware law, in one case, that predates the relevant statute by nine years. *Phillips*, 738 F. Supp. at 837-38.

All told, it may very well be true that the common scheme and principle across the nation is that general partners will be held liable for every act, tortious or otherwise,

committed by other partners or by the partnership itself. But a general principle will not trump a conscious legislative choice. Partnership law is entirely statutory, as plaintiff himself notes, and to the best of this Court's knowledge, there is nothing in Delaware's statutory scheme, or the case law interpreting it, that enables this Court to hold general partners liable for the fraudulent torts committed by co-partners or the partnership. *See* DEL. C. § 15-306(a); *Folk*, § 17-403.04. The absence of any source indicating that Delaware law in its present form allows for tort liability to be imputed is sufficient for this Court to withhold imposing individual liability, rather than obligational liability, on Edwards and Gray solely on the basis of BIM and Archipel's defaults.

This is not a merely academic difference. Of course, assuming that the individual defendants still qualify as general partners and are answerable for plaintiff's judgment, the partnership's newfound debt to plaintiff would be attributable to its partners. However, this Court need not decide any of those issues at this juncture.

Despite Edwards' and Gray's potential liability for the partnership's debts, a judgment creditor of a limited partnership "may not levy execution against the assets of the general partner to satisfy a judgment based on a claim against the limited partnership" unless: (1) plaintiff has issued a writ of execution against the limited partnership that has been returned partially or completely unsatisfied; (2) the limited partnership is a debtor in bankruptcy; (3) the general partner has waived exhaustion of the limited partnership's assets; (4) a court grants permission of the judgment creditor to levy execution against the general partner's assets; or (5) liability is imposed on the general partner by law or contract independent of the partnership's existence. 6 DEL. C. § 17-403(d).

Thus, until and unless McEssy satisfies one of the five conditions stated above, he has no right or ability to recover from either of the individual defendants' assets to satisfy his

judgment against BIM.  It is thus irrelevant at this juncture whether and to what extent Edwards remains a general partner of BIM despite the subsequent amendment to BIM's certificate of limited partnership.  Edwards Dep. 226-27.  That issue can be decided after the question of these defendants' individual liability.

### C.  **PLAINTIFF'S CLAIMS AGAINST GRAY.**

McEssy has moved for summary judgment against Gray on three counts:  (I) securities fraud under § 10(b); (V) common law fraud; and (VII) breach of a fiduciary duty.[12]

### 1.  **SECURITIES FRAUD.**

Once again, the elements of a private securities fraud claim under § 10(b) are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx*, 563 U.S. at 37-38.

McEssy seeks to establish the first three elements of securities fraud through nonmutual offensive collateral estoppel.  Nonmutual offensive collateral estoppel[13] is a species of issue preclusion that "preclude[s] a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff."  *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79 (2d Cir. 2019) (alteration in original) (internal citations and quotation marks omitted).

---

[12] As plaintiff notes, Gray has failed to respond to his Statement of Material Facts.  Those facts are thus deemed admitted against him where properly supported by the record.  N.D.N.Y. LOCAL RULE 7.1(a)(3).  Furthermore, even were this Court of a mind to interpret Gray's response as a Declaration pursuant to Rule 56(d)(2) asking this Court to reopen discovery, as plaintiff notes, United States Magistrate Judge Thérèse Wiley Dancks has already denied the American defendant an extension of the discovery deadline that he requested on the same basis. Dkt. 227.  This Court would not disturb Magistrate Judge Dancks' prior ruling, coming as it does from a position of close familiarity with the discovery process of this case.  Dkt. 232.

[13] Having demonstrated its awareness of the particular brand of collateral estoppel plaintiff's arguments present, for brevity this Court will simply refer to this principle by the generic "collateral estoppel" for the remainder of this Opinion, though nonmutual collateral estoppel is the only variant the parties discuss.

In the Second Circuit, four conditions must be satisfied to allow for collateral estoppel to apply: (1) the issues in the prior and present action must be identical; (2) the issue in the prior proceeding must have been actually litigated and decided; (3) the defendant must have had a full and fair opportunity for litigation in the prior proceeding; and (4) the issue litigated must have been necessary to the final judgment on the merits of the prior proceeding. *See Faulkner v. Nat'l Geographic Enters.*, 409 F.3d 26, 37 (2d Cir. 2005). Additionally, however, collateral estoppel of this sort must be fair to the defendant and promote judicial economy. *Bifolck*, 936 F.3d at 80 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

In general, "[c]ourts have applied collateral estoppel in the securities fraud context" where a criminal defendant has pled guilty to criminal securities fraud under § 10(b). *See, e.g.*, *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) (collecting cases). After all, "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel . . . in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. U.S. Currency in the Amount of $119,984*, 304 F.3d 165, 172 (2d Cir. 2002).

This Court sees no cause to depart from this rule. Gray's guilty plea established beyond a reasonable doubt that he committed every element of criminal securities fraud for the same events that form the basis of this lawsuit. Dkt. 242-22, p. 17 (the American defendant's admitting that he sought $5 million from an investor to hide his losses on the Twitter investment). He can hardly hope to argue now that McEssy cannot prove those facts by the lesser standard of a preponderance. The conviction is additionally final.

Lastly, it is in no way unfair for Gray's admitted and acknowledged crimes not to be used against him to help redress the people he wronged. Thus, every identical issue between his conviction for securities fraud and the claims advanced here is deemed proven

because the American defendant is estopped from arguing otherwise.  *See Haligiannis*, 470

F. Supp. 2d at 382 (applying collateral estoppel to SEC plaintiff's civil suit against defendant

who pled guilty to criminal securities fraud).

McEssy admits, however, that the elements of the criminal and civil variants of

securities fraud are not coextensive.  There are three elements of criminal securities fraud:

(1) scienter; (2) a scheme or artifice to defraud; and (3) a nexus with a security.  *United*

*States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009).  A scheme or artifice to defraud

includes a material misrepresentation or omission.  *See United States v. Vilar*, 729 F.3d 62,

98 (2d Cir. 2013).  However, the prosecution need not prove that the victims "actually relied

on the material misrepresentation or omission" that constituted the fraud.  *Id.*

Therefore, as McEssy correctly notes, he still has the burden of proving that he relied

on Gray's misrepresentation that he would purchase Uber stock, that he suffered economic

loss, and that his reliance caused that economic loss.  *Matrixx*, 563 U.S. at 37-38.

As for reliance, "'[t]he traditional (and most direct) way' for a plaintiff to demonstrate

reliance 'is by showing that he was aware of a company's statement and engaged in a

relevant transaction . . . based on that specific misrepresentation."  *Amgen Inc. v. Conn. Ret.*

*Plans and Tr. Funds*, 568 U.S. 455, 462 (2013) (citing *Erica P. John Fund, Inc. v. Halliburton*

*Co.*, 563 U.S. 804, 810 (2011)).  Where a plaintiff can identify such a specific

misrepresentation, a plaintiff "plainly would have relied on the company's deceptive conduct."

*Halliburton*, 563 U.S. at 810.

The record before this Court is unassailably clear that on May 20, 2014, Gray

personally met with McEssy at his office to discuss an investment opportunity in Uber that did

not exist.  Hall Dep. 37-38; Gray Dep. 26 (the American defendant's admission that the Uber

transaction "was a fraud that [he] created by [him]self, trying to buy [him]self time").  Plaintiff

has provided more than enough evidence such that no reasonable jury could conclude that he did not rely on the existence of the opportunity to purchase Uber stock—and the American defendant's promise that he would give him his money back if that opportunity fell through—in his decision to pay the American defendant $5 million.  Plaintiff Dep. 81, 96; Dkt. 242-6, pp. 48-50.

Similarly, McEssy has more than adequately proven that he suffered economic loss caused by Gray's misconduct.  First, the economic loss element exists largely so that where a plaintiff is defrauded as to the value of a stock, but the stock he purchases nevertheless causes him economic gain, he cannot recover.  *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37-38 (2d Cir. 2012) (discussing whether subsequent increase in stock price above inflated value of which defendant misinformed plaintiff precluded finding of economic loss).  That plaintiff suffered economic loss when the misrepresentation was that the American defendant would purchase him stock at all is obvious; he lost $5 million and received nothing in return.

Second, Gray conclusively caused that economic loss.  To clarify, proving reliance establishes causation of a sort:  transaction causation.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509-10 (2d Cir. 2010).  If a plaintiff relied on the defendant's misrepresentation or omission, that misrepresentation or omission was the but-for cause of plaintiff's engaging in the fraudulent transaction and thus it caused the transaction.  *Id.*

Plaintiffs must also prove loss causation, however.  *In re Omnicom*, 597 F.3d at 510.  Loss causation requires proving both that the wrongful act was the but-for cause of the economic loss and that the harm was sufficiently proximately caused by the wrong to be of a sort that § 10(b) was intended to prevent.  *Id.*  As such, a misrepresentation is "the 'proximate

cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations . . . ." *Id.* at 513 (emphasis omitted).

McEssy has comfortably proven causation such that no reasonable juror could conclude that Gray's fraud was not the but-for and proximate cause of his loss. If the American defendant had not lied to plaintiff about the chance of investing in Uber, plaintiff would still have his $5 million. Gray Dep. 26. It is also safe to say that the zone of risk for a misrepresentation of an opportunity to purchase stock includes that the plaintiff would seek to purchase that stock. *In re Omnicom*, 597 F.3d at 513.

Accordingly, McEssy has provided evidence such that no reasonable juror could conclude that Gray did not engage in securities fraud in violation of § 10(b). He therefore merits summary judgment against the American defendant on Count I.

### 2. <u>COMMON LAW FRAUD.</u>

McEssy alleges two theories of recovery for fraud: (1) Gray's falsehoods in assuring him that the stock was available and that he could get his money back if it had not been attained within twenty-one days; and (2) the American defendant's misrepresentations as to the nature and extent of his disciplinary history.

For much the same reasons discussed above, McEssy merits summary judgment against Gray on this count. He openly admitted that the entire Uber transaction "was a fraud" intended to cover for his commingling funds for the Twitter scheme. Gray Dep. 26. That he requested the funds from plaintiff with a specific purpose of covering his mistakes with Twitter demonstrates that he intended that plaintiff would act. *Id.*

Similarly, because this Court feels safe in its assumption that McEssy did not give Gray $5 million as an act of charity, plaintiff has established his reliance on the American defendant's promise of either Uber shares or a refund. Plaintiff Dep. 81, 96; Dkt. 242-6,

pp. 48-50. Because neither the shares nor the refund followed, that reliance caused injury. Dkt. 242-15, ¶¶ 34-35. Having proven every element such that no reasonable jury could conclude that the American defendant did not commit fraud based on the Uber transaction, plaintiff is thus entitled to recovery on this claim. *See Kapelanski v. Johnson*, 390 F.3d 525, 531-32 (7th Cir. 2004) (upholding jury verdict for plaintiff where defendant promised to invest plaintiff's money in nonexistent opportunity).

### 3. **BREACH OF FIDUCIARY DUTIES.**

Where a purported fiduciary relationship is not of a per se category such as lawyer-client or guardian-ward, Illinois law requires that this relationship be established by clear and convincing evidence. *See Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992). Far from belonging to this class, an investment advisor is "not automatically a fiduciary of his advisee." *Hollerich v. Acri*, 259 F. Supp. 3d 806, 814 (N.D. Ill. 2017) (citing *Burdett*, 957 F.2d at 1381).

Rather, "[a] fiduciary duty may arise in such a relationship when the advisee places trust and confidence in the advis[o]r such that the advis[o]r has gained influence and superiority over the advisee." *Hollerich*, 259 F. Supp. 3d at 814. However, the Seventh Circuit has recently viewed this requirement somewhat more leniently, ruling almost as a matter of course that an investment company "owed its clients a fiduciary duty of good faith." *United States v. Bloom*, 846 F.3d 243, 247 (7th Cir. 2017).

McEssy alleges a varied and exhaustive list of Gray's misconduct that he claims constitute breaches of his fiduciary duties to plaintiff. Those allegations repeat his claims concerning the American defendant's misrepresentations as to his disciplinary history, repeat his claims concerning the entire Uber scheme, and also include claims that the American defendant lied to investors about how many Twitter shares he had purchased.

As to the first element of a breach of fiduciary duty, there is no genuine question of fact that Gray owed McEssy that duty. The Eastern District of Illinois in *Hollerich* found that a fiduciary duty existed based solely on that plaintiff's trusting that defendant with $500,000 of his money to invest. *Hollerich*, 259 F. Supp. 3d at 812, 814. Plaintiff's trusting the American defendant with more than $5 million certainly meets this standard and establishes that he owed plaintiff a fiduciary duty. Plaintiff Dep. 57.

There is also no question of fact that Gray's intentional fraud through the course of the Uber scheme amounts to a breach of any fiduciary duties he had, and as discussed above plaintiff has established injury. Plaintiff thus has established that he merits summary judgment for this basis of his breach of fiduciary duty claim. *See, e.g.*, *Hollerich*, 259 F. Supp. 3d at 814-15 (granting summary judgment for plaintiff where defendant committed securities fraud as investment advisor).

Similarly, McEssy's argument that Gray breached a fiduciary duty by misleading him about the amount of Twitter stock available merits summary judgment in his favor. If the American defendant had not lied about the number of Twitter shares he had purchased, he would never have needed the Uber fraud to cover for the resulting debt. He cannot credibly argue that his lie did not proximately cause the further lies necessary to dig himself out of the hole the first lie created. Gray Dep. 26. Accordingly, plaintiff has established causation. Lastly, the American defendant's outright lie concerning the precise area in which plaintiff trusted him—attaining securities—constitutes a breach of his fiduciary duty. Plaintiff has thus established a breach of a fiduciary duty on this basis as well.

### 4. <u>SUMMARY.</u>

McEssy has demonstrated that his claims against Gray for Count I, securities fraud, merit summary judgment. Additionally, his claims against the American defendant for Count

V, common law fraud, merit summary judgment in his favor.  Finally, his claims for Count VII, breach of fiduciary duty also merit summary judgment.[14]  However, much as was discussed above for plaintiff's claims against BIM and Archipel, this leaves several counts, namely Counts II-IV, VI, and VIII-XV unresolved and untended.  Thus, for the same reasons discussed above, plaintiff must also show cause why these claims should not be dismissed for failure to prosecute under Rule 41(b).

### D.  PLAINTIFF'S CLAIMS AGAINST EDWARDS.

McEssy has also moved for summary judgment against Edwards and Bennington for his three remaining claims against these defendants:  (I) securities fraud under § 10(b); (V) common law fraud; and (VII) breach of a fiduciary duty.

### 1.  SECURITIES FRAUD.

The elements for securities fraud of course remain the same for Edwards as they were for Gray.  In proving his claim of securities fraud against the other defendant, McEssy has by necessity already proven that the fraudulent scheme that he alleges was related to a security and caused him economic loss.  Thus, the Canadian defendant can only dispute the elements of:  (1) a misrepresentation or omission; (2) scienter; (3) reliance; and (4) loss causation.  *Matrixx*, 563 U.S. at 37-38.

McEssy alleges two courses of fraudulent conduct:  (1) Edwards' alleged scheme to defraud investors by bolstering Gray's reputation with his own; and (2) his complicity in his counterpart's scheme to comingle funds to cover the losses of the varied Archipel entities.

McEssy's first theory of Edwards' fraud is that he engaged in a scheme to defraud the Archipel entity investors by exaggerating his supervisory role to allay any fears they might have harbored about doing business with Gray.  As such, it is important to note that in the

---

[14] For the same reasons discussed above, Gray's personal liability is not imputable to Edwards directly.

§ 10(b) context, a scheme to defraud is "any plan, device[,] or course of action to obtain money or property by false or fraudulent representations." *Stinn v. United States*, 856 F. Supp. 2d 531, 536 (E.D.N.Y. 2012).

McEssy's first evidence of a scheme to induce his investment is the PPMs' prominent placement of Edwards as the first manager of BIM. Edwards Dep. 187. The PPMs state in no uncertain terms that "[t]he following individuals will manage [BIM] and oversee its operations[,]" and the first manager listed is the Canadian defendant. *Id.* Plaintiff argues that this amounts to a misrepresentation the Canadian defendant would personally oversee and safeguard the investment practices of the various investment entities despite his admission that he did nothing of the sort. Edwards Dec. ¶ 13.

Additionally, McEssy provides as evidence of a scheme to defraud Edwards' varied statements during actual meetings between the two. Plaintiff has provided evidence that at the November 2013 meeting, the Canadian defendant displayed a strong knowledge base in the investment option in Lineagen, which plaintiff and Hall interpreted to suggest that he had a strong familiarity with the Archipel investment opportunities. Hall Dep. 35-36.

McEssy also points to Gray's description of Edwards at the same meeting as the "chairman of the board" and the American defendant's partner, which, given the lack of force that either of those titles actually carried, could be interpreted as platitudes to strengthen plaintiff's perceived connection between the individual defendants. Hall Dep. 35. This inference is only exacerbated by the Canadian defendant's alleged repetition of his American counterpart's description of his role. *Id.* at 36. Moreover, plaintiff testified that the Canadian defendant downplayed the American defendant's disciplinary history at this meeting, further lending credence to the notion that he worked to support the American defendant's credibility. Plaintiff Dep. 41.

For his last piece of evidence illustrating Edwards' alleged scheme to instill confidence in would-be investors, McEssy provides his testimony that the Canadian defendant said during the May 20, 2014 meeting that he would have liked to have purchased some of the Uber shares had plaintiff not purchased them all himself. Plaintiff Dep. 61. This statement, plaintiff contends, further illustrates the Canadian defendant's interest and involvement in the Archipel entities. Similarly, he asserts that the Canadian defendant's forwarding an email to Hall discussing how valuable Uber would be hints that he had a larger role in the investment mechanisms than he did in truth. Dkt. 242-6, p. 43.

For Edwards' part, he claims that his only interaction with the PPMs was providing his biographical information and reviewing a single draft. Edwards Dep. 12; Edwards Dec. ¶¶ 16-18. He testified at his deposition that to the best of his knowledge, he did not tell any lawyer drafting the PPMs to include the information that he was a part owner of BIM. Edwards Dep. 17. His story is thus that if the PPMs were materially misleading, it was not he that made that misrepresentation, and in fact he was unaware of any deceptive elements to the documents.

Further in Edwards' favor is the simple fact that he met McEssy only three or four times throughout their multi-year relationship, and never spoke to him over the phone or by mail. Plaintiff Dep. 56, 62. Plaintiff invested over $5 million in the Archipel entities, and if the Canadian defendant truly intended to craft a deceitful scheme to create an illusion of his control and activity within the enterprise, there is reason to expect that, of all Archipel entity clients, he would have maintained better contact with plaintiff, a multi-million dollar investor.

Both Edwards' and McEssy's narratives have evidentiary support and are logically plausible. A reasonable juror could conclude that the Canadian defendant knew that the PPMs listed him prominently and declared him a manager, and thus adopted that statement

as his own.  Edwards Dec. ¶¶ 16-18.  Additionally, his presentation as knowledgeable in the Archipel entities' investments, his efforts to downplay Gray's disciplinary history, and his comments encouraging plaintiff to invest in Uber would all allow for the reasonable inference that he was attempting to create an illusion of his control and influence on the company to encourage investors to part with their money.

Conversely, a reasonable jury could also conclude that Edwards had a minimal role in publishing the PPMs and simply did not think about whether his status as a manager or his primacy in the PPMs' listing meant anything of substance.  Moreover, the Canadian defendant's minimal contacts with McEssy throughout their business relationship undercut the notion that he truly intended to exaggerate his role in the Archipel entities.  Thus, there is a question of fact as to whether the Canadian defendant piloted a scheme to defraud potential investors by using his reputation and experience to cover for Gray's lack of the same.

Furthermore, there is a question of fact as to whether Edwards' involvement in the Archipel entities was material.  A misstatement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (alterations in original) (internal citations  and quotation marks omitted).  A reasonable juror could conclude that, given Gray's disciplinary history, the Canadian defendant's reputation and status as an active manager would be important in deciding whether to invest in an Archipel entity.

But a reasonable juror could also conclude that, because Gray was a much more active figure in Archipel's businesses, his name and reputation alone mattered.   In other words, the evidence allows for a reasonable conclusion that Edwards played too minor a role

in interacting with clients to alter their investment calculus.  Dkt. 242-4, p. 4 (the American defendant's describing the Canadian defendant as a mentor or "godfather" rather than an active manager); *see* Edwards Dec. ¶ 13 (the Canadian defendant declaring that he never managed the Archipel entities and only visited the offices "approximately four times over four years").

As for the element of scienter, McEssy argues that because Edwards was aware that Gray had a questionable disciplinary history—and in fact called him "pathetic" for failing to disclose that history in the PPMs—the Canadian defendant intentionally allowed his name to be used to bolster the credibility of the enterprise.  Edwards Dep. 7-8, 135.  As further evidence that his counterpart could be an impediment to investments if unsupported, Hilary DeCesare ("DeCesare"), the CEO of one of the Archipel investment entities, told the Canadian defendant in 2011 that she was only interested in working with him but did not want to work with his American counterpart.  Dkt. 242-10 ("DeCesare Dep."), pp. 6, 9.

Edwards counters McEssy's argument by pointing out that he himself did not believe that Gray's disciplinary history was concerning because there was no evidence of fraud.  Edwards Dep. 7-8.  Thus, he felt no need to include this information, and felt that it was not sufficiently serious that an investor should know of it.  *Id.* at 18.  He testified at his deposition that instead he left the decision of whether to include the history, and how to present his own credentials, to the attorneys drafting the PPMs.  *Id.* at 17-18.  Also in the Canadian defendant's favor is the fact that DeCesare did not react to the American defendant's disciplinary history or ability, but instead his personality, undermining plaintiff's argument that the American defendant's history made him unsuccessful in finding investments without the Canadian defendant's support.  DeCesare Dep. 6, 9.

Once again, a reasonable factfinder could draw the inference that because of Gray's tarnished disciplinary record, Edwards would understand that his credentials would counterbalance his history and support the Archipel entities' reputation. Similarly, a reasonable factfinder could credit the Canadian defendant's testimony that he did not have an active hand in drafting the PPMs and that a personal dislike on the part of one actor does not evince any knowledge that the American defendant's reputation needed support. The issue of scienter on this theory of fraud therefore also merits trial.

As evidence of reliance, McEssy points to the PPMs' holding Edwards out as an industry professional with an extensive investment experience and lauding the extensive assets he managed for "high net worth" investors. Edwards Dep. 187. Plaintiff has testified that the PPMs' assertion that the Canadian defendant would be a general partner responsible for overseeing the Archipel entities was an important consideration for him. Plaintiff Dep. 36-37.

Moreover, McEssy's testimony that "the fact that [Edwards] was going to be the general partner and the managing partner made [plaintiff] feel comfortable" because he felt upon meeting the Canadian defendant that he was "a person [plaintiff] could rely on" of course is useful to prove that plaintiff relied on the Canadian defendant's presence with the company. Plaintiff Dep. 58.

In Edwards' favor, however, is the fact that he did not even meet McEssy until after the latter had already become a client of the Archipel entities. *See* Plaintiff Dep. 33. By extension, the evidence allows for a rational factfinder to draw the conclusion that including the Canadian defendant's biography and managing partner status when he would be nothing to plaintiff but a faceless name was unimportant, because it was Gray, not his Canadian counterpart, who approached plaintiff, met with him, and was ultimately responsible for

41

making the investment pitch.  Plaintiff Dep. 20, 28; Dkt. 242-16, p. 2.  Thus, especially for plaintiff's initial investments in Bloom and Twitter before he met the Canadian defendant, a reasonable factfinder could conclude that plaintiff did not rely on his management of the Archipel entities.

But the question of reliance continues even to the Uber scheme.  In particular, McEssy stated in his deposition that he never contacted Edwards to ask for his missing refund for the Uber transaction.  Plaintiff Dep. 96.  In fact, he never directly contacted the Canadian defendant at all to discuss the Uber investment beyond their in-person meetings.  *Id.* at 65.  A jury could find that if the Canadian defendant's oversight and direction was such an important factor in plaintiff's decisions to invest, he would have reached out to the Canadian defendant to discuss his concerns.  Therefore, there exists a question of fact fit for a jury as to whether plaintiff relied on the Canadian defendant's oversight.

Finally, there is a question of fact as to whether McEssy's reliance—if proven—on Edwards' connection to the Archipel entities in his decision to invest caused his injuries.  It is possible for a reasonable finder of fact to conclude that the Canadian defendant's biography and investment experience would lead to investors who may have been undecided about the Archipel entities' viability deciding to invest.  Similarly, assuming that a factfinder would conclude that the Canadian defendant was aware that his reputation might induce investment, an investor who justifiably doubted Gray but trusted the Canadian defendant and lost money because the American defendant mishandled their funds occupies the "zone of risk" that is attendant to the Canadian defendant's misleading use of his reputation.  *In re Omnicom*, 597 F.3d at 513.

Conversely, for McEssy's initial investments, a reasonable factfinder could reach the conclusion that Edwards' biography, divorced from any actual interaction with him or

representations made exclusively by him, was not the "but-for" cause of plaintiff's investments.  *In re Omnicom*, 597 F.3d at 509-10.  Indeed, plaintiff has submitted limited evidence that he had any doubts about Gray or the Archipel entities such that he needed the Canadian defendant's presence to reassure him as to the validity of the Archipel entities' proposed investments.  The same logic holds true for the Uber investment:  plaintiff may have felt more secure in the investment because of the Canadian defendant's presence, but that does not necessarily mean that his presence induced plaintiff to act.  Therefore, there is a valid question of fact as to this element as well.

For McEssy's theory of Edwards' alleged scheme to defraud by supporting Gray's reputation with his own, there thus remain questions of fact for each of the elements of:  (1) a material misrepresentation or omission; (2) scienter; (3) reliance; and (4) causation.

McEssy's second theory of a scheme to defraud is subject to at least as many questions of fact.  Plaintiff's alternative theory is that Edwards was aware of Gray's inability to procure Uber stock and the general disarray of the Archipel entities and misled plaintiff to encourage his investments despite the American defendant's increasingly fraudulent mode of business.

The record strongly shows that Edwards was far enough removed from running the Archipel entities that he was ignorant of how badly those enterprises had fallen apart.  *See, e.g.*, Edwards Dep. 54; Edwards Dec. ¶ 13.  In fact, McEssy points to no piece of evidence that suggests that the Canadian defendant knew that Gray could not purchase Uber shares.  Instead, his own testimony and the documentary evidence demonstrates that the Canadian defendant believed his counterpart, and if anything was disappointed that he was not included in what he believed to be a strong investment opportunity.  Edwards Dep. 73-74, 146.

Thus, although McEssy has defeated Edwards' motion for summary judgment by demonstrating a question of fact as to his scheme to use his reputation to bolster Gray's, plaintiff's showing that the Canadian defendant was an active perpetrator of the Uber scheme is quite weak. Plaintiff is therefore not entitled to summary judgment in his favor for Count I, § 10(b) securities fraud under either of the two theories he advances.

## 2. **COMMON LAW FRAUD.**

As McEssy correctly notes, the analysis of his claims against Edwards for common law fraud operate along much the same lines as his claims of § 10(b) securities fraud. The elements of material misrepresentation or scheme to defraud,[15] intent to defraud,[16] reasonable reliance, and damages caused by reliance comprise both § 10(b) fraud and Illinois common law fraud. *Cf. In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 49, 59-60 (S.D.N.Y. 1993) (identifying common flaws in proof of common law fraud under functionally identical New York law and § 10(b)).

The only dissimilarity between the two torts is that § 10(b) requires relation to a security, while common law fraud does not. Because the element of relation to a security is one of the few elements not in dispute, there remain the same questions of fact for Count V, common law fraud, as for the Count I § 10(b) claim.

## 3. **BREACH OF FIDUCIARY DUTY.**

McEssy's claims against Edwards for breach of fiduciary duty are, again, decided by the same three elements as were relevant to his claims against Gray: (1) the Canadian

---

[15] Much as applies to § 10(b) claims, under Illinois law, a scheme to defraud is "a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *GMAC, LLC v. Hillquist*, 652 F. Supp. 2d 908, 921 (N.D. Ill. 2009).

[16] The element of scienter as required by § 10(b) requires an "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), which is functionally equivalent to an intent that a plaintiff act in reliance on a statement that a defendant knows is false, see *Wood v. Maguire Auto. LLC*, 2011 WL 4478485, at *7 (N.D.N.Y. Sept. 26, 2011) (defining scienter as identical to "intent to defraud the plaintiff" as required by Illinois common law).

defendant's owing a fiduciary duty; (2) his knowing breach of that duty; and (3) damages caused by that breach. *In re Odeh*, 431 B.R. at 812.

In assessing whether a fiduciary duty is created out of a business transaction under Illinois law, "a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 946 (N.D. Ill. 2013). "If a person solicits another to trust him in matters in which he represents himself to be an expert and the offer is accepted, a fiduciary relationship may be found." *Id.*

However, "[b]ecause the essence of a fiduciary relationship is dominance of one party by the other . . . in the absence of dominance and influence there is no fiduciary relationship *regardless of the level of trust between the parties*." *Al Maha*, 936 F. Supp. 2d at 946 (emphasis added) (internal citations and quotation marks omitted).

First, McEssy's argument that Edwards owed him a fiduciary duty because the Canadian defendant was a general partner of BIM, which in turn was a general partner of the Archipel entities, cannot serve as the basis of a duty owed to plaintiff. The Canadian defendant's duty as a general partner of BIM is to BIM itself, not the customers of the Archipel entities. Plaintiff's argument that the Canadian defendant owes him a duty because he was a customer of one partnership, whose general partner was *another* partnership, of which the Canadian defendant was in turn a general partner, is nonsense. That argument is far too remote to vest the Canadian defendant with a duty to plaintiff.

Thus, McEssy must prove that Edwards owed him a fiduciary duty directly. He cannot. Plaintiff's allegations are entirely centered around his trust in the Canadian defendant. Plaintiff Dep. 58. Nowhere, however, does he allege that the Canadian defendant exerted

any dominance or influence over him.  *Al Maha*, 936 F. Supp. 2d at 946.  Instead, it was Gray that:  (1) presented plaintiff with the investment opportunities in the Archipel entities; (2) plaintiff trusted with millions of his dollars; and (3) he ultimately relied on to secure the investment opportunities.  Plaintiff Dep. 20, 28.

Even assuming the facts in the light most favorable to McEssy, his claims amount to his feeling more comfortable trusting Gray with his money because he believed that Edwards worked with him.  Reassurance is a far cry from dominance, or even from influence.  Plaintiff's confidence and trust in the Canadian defendant are not enough to create a fiduciary duty in the face of the utter lack of contact between plaintiff and the Canadian defendant and the far more prominent role that the American defendant played in their business together.  Plaintiff Dep. 56, 62, 96.  This is especially true because, given the lack of a *per se* fiduciary relationship, plaintiff bears the burden of proving that the Canadian defendant owed him a fiduciary duty by clear and convincing evidence.  *Burdett*, 957 F.2d at 1382.

McEssy has thus failed to establish that Edwards owed him a fiduciary duty under the clear and convincing evidence standard, and this claim against the Canadian defendant must be dismissed with prejudice.  *See, e.g.*, *Al Maha*, 936 F. Supp. 2d at 945-46.

### 4. SUMMARY.

McEssy has not demonstrated any claim against Edwards that merits summary judgment in his favor.  For his part, the Canadian defendant has only demonstrated that he merits summary judgment on plaintiff's claimed breach of fiduciary duty under Count VII of the SAC, and for the remaining two counts only for the very limited purpose of establishing that the Canadian defendant was not a direct and active participant in the Uber scheme.  Thus, the remaining issues of whether the Canadian defendant is liable to plaintiff for securities fraud and common law fraud can only be resolved through trial.

### E. **PLAINTIFF'S CLAIMS AGAINST BENNINGTON.**

The parties have done this Court no favors in assessing plaintiff's claims against Bennington. Indeed, the only clear reference to this entity's structure is in Edwards' declaration where he notes that he "incorporated" this defendant entity in 2007. Edwards Dec. ¶ 9. This Court will thus assume that this defendant is a corporation.

A corporation may be held liable for the misconduct of its owner only if the plaintiff can prove that it is appropriate to pierce the corporate veil. *See Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997). Under New York law,[17] a court may pierce the corporate veil where (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue[;]" and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

Although typically piercing the corporate veil allows for the imputation of personal liability on a director of the corporation, "reverse" veil-piercing allows for a corporation to be held liable for the wrongful acts of its directors. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004). The elements for reverse veil-piercing are the same as for the traditional variant. *Id.*

---

[17] New York's choice of law rules provide that generally "the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fillmore East BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014) (summary order). Bennington is organized under the laws of Canada. Edwards Dec. ¶ 9. However, although Rule 44.1 "authorizes courts, at their discretion, to examine the content of foreign law independently, . . . the rule does not, by any means, 'require them to do so in the absence of any suggestion that such a course will be fruitful *or [in the absence of] any help from the parties.*'" *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 214 (S.D.N.Y. 2002) (emphasis in original) (citing *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968) (Friendly, J.)). Neither party has provided this Court with any indication that Canadian law on piercing the corporate veil would alter the outcome of this case. Thus, they have impliedly consented to New York law. *See United Feature Syndicate*, 216 F. Supp. 2d at 214 (applying New York law where parties do not dispute the governing law but Canadian law for piercing veil because parties disputed governing law on that issue).

There is little doubt that Edwards dominated Bennington, because he was its sole shareholder and formed it entirely to hold securities licenses so that he could continue to work as an investment advisor after his retirement.[18]  Edwards Dec. ¶ 9, Edwards Dep. 10. However, there is even less evidence that this defendant's domination was used in any way to commit the fraud that McEssy alleges.  Plaintiff has made no allegations at all as to what role Bennington played in the scheme he alleges, and instead repeats in conclusory fashion that Bennington was liable through Edwards.

The only concrete evidence of any connection at all between Bennington and this action is that it is a part owner of BIM.  Edwards Dep. 16.  Because McEssy bears the burden of establishing that this Court should attribute Edwards' alleged misconduct to Bennington, yet he has provided no evidence that Bennington was a vehicle for any fraud beyond mere ownership by the Canadian defendant and its own partial ownership of BIM, plaintiff's claims against Bennington must be dismissed with prejudice.  *See, e.g., Taizhou Zhongneng Imp. & Exp. Co. v. Kousobinas*, 509 F. App'x 54, 57 (2d Cir. 2013) (affirming dismissal of piercing the corporate veil claim where there were no allegations corporate domination was used to commit wrong that proximately caused harm to plaintiff).

## F. DAMAGES.

This Court's dispositions on liability having been established, it now turns to damages for the claims for which liability has attached.

### 1. BIM AND ARCHIPEL.

"The decision whether to grant prejudgment interest [on a federal claim] and the rate used if such interest is granted are matters confided to the district court's broad discretion[.]" *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995).  In

---

[18] Plaintiff's supplied excerpts from Edwards' deposition cut out his explanation of why Bennington was formed and what precisely that defendant meant by holding his security licenses.  *See* Edwards Dep. 10-11.

deciding whether prejudgment interest is warranted, a court should consider: "(i) the need to fully compensate the wronged party for actual damages suffered[;] (ii) considerations of fairness and the relative equities of the award[;] (iii) the remedial purpose of the statute involved[;] and/or (iv) such other general principals as are deemed relevant by the court." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

Similarly, under Illinois law, prejudgment interest "is a matter within the sound discretion of the trial court . . . ." *In re Estate of Miller*, 778 N.E.2d 262, 272 (Ill. App. Ct. 2002). By contrast, "awarding pre-judgment interest on damages awarded for [New York state law] fraud is mandatory[.]" *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1166 (E.D.N.Y. 1996) (citing *Mfr. Hanover Tr. Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir. 1986) (additional citations omitted).

For his motion for partial default judgment, McEssy asserts a right to $7,950,101.00.[19] He calculates these damages based on his four investments in Bloom and his $5 million investment in Late Stage, totaling $5,665,035.00. Dkt. 242, ¶¶ 216-17. In addition, he adds to this total New York's 9% statutory pre-judgment interest, calculated based on the date he paid for each investment. *Id.* ¶¶ 218-19.

There are two problems with McEssy's proof of damages. First, his calculation relies on the Expert Report of Craig Jacobson, which plaintiff has not submitted to this Court for review. Second, a court deciding state law claims must again apply the choice of law rules of its forum state to determine whether to award prejudgment interest. *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999). For the reasons discussed above, that requires this Court to apply Illinois law.

---

[19] Plaintiff states in his motion that he is also entitled to $7,241,250.00. Dkt. 244, p. 2. He does not point to any reason for this additional award, nor does he include it in his proposed judgment. Dkt. 244-3, pp. 2-3. Presumably, inclusion of this additional award is a mistake, but the motion itself is unclear.

Thus, contrary to McEssy's assumptions, he is not entitled to New York's 9% prejudgment interest rate. Nor, in fact, is he automatically entitled to prejudgment interest at all. *Endico Potatoes*, 67 F.3d at 1071 (noting that federal prejudgment interest rates for § 10(b) claims are within court's discretion); *In re Estate of Miller*, 778 N.E.2d at 272 (noting same under Illinois law).

Given how completely the parties have missed their mark in arguing this point— indeed, Edwards and Bennington, the only counselled defendants to appear, did not even address the propriety of McEssy's claimed damages—this Court will not now consider completely unaided the appropriateness of prejudgment interest. Once the varied issues of liability have been more definitively resolved, this Court will determine: (1) the amount of damages owed by each defendant; (2) the propriety and amount of prejudgment interest; and (3) the propriety of punitive damages.[20] For now, however, and especially because several outstanding claims remain against the defendants for whom liability has been established, this Court defers judgment on what damages plaintiff is entitled to from BIM and Archipel.

## 2. **GRAY.**

There also remain questions of fact as to the damages owed to McEssy by Gray for his counts of: (V) common law fraud; and (VII) breach of fiduciary duty. Plaintiff argues that he suffered injury from a fraud and breach of duty caused by the American defendant's efforts to hide his disciplinary history.

However, in attempting to satisfy the element of reliance under Illinois law, "a party is not justified in relying on representations made when he has ample opportunity to ascertain

---

[20] Under Illinois law, "punitive damages may be awarded where the defendant's conduct 'is characterized by wantonness, malice, oppression or other circumstances of aggravation.'" *Fifth Third Mortg. Co. v. Kaufman*, 2017 WL 4021230, at *11 (N.D. Ill. 2017) (citing *Gehrett v. Chrysler Corp.*, 882 N.E.2d 1102, 1117-18 (Ill. App. Ct. 2008)). Thus, "[i]n an action for fraud, punitive damages are appropriate where the false representations are wantonly and designedly made." *Fifth Third Mortg.*, 2017 WL 4021230, at *11 (internal citations and quotation marks omitted).

the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth . . . he cannot be heard to say he was deceived by misrepresentations." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882 (7th Cir. 2005).

As Edwards and Bennington note, the SEC's opinion upholding Gray's NYSE sanctions was and is publicly available. Indeed, the first result of a search for "Gregory Gray NYSE violation" is the full SEC opinion, providing a detailed explanation of every allegation and the related findings of fact. Gray Dep. 41-59, *see, e.g.*, GOOGLE SEARCH, https://www.google.com/search?client=firefox-b-1-d&q=gregory+gray+nyse+violation (last visited November 26, 2019). McEssy cannot argue that no reasonable juror could not see the ready availability of the SEC opinion and find that plaintiff had ample opportunity to ascertain the truth of the American defendant's misconduct. *Davis*, 396 F.3d at 882.

Thus, there are questions of fact as to whether Gray's misrepresentations about the extent of his disciplinary history damaged McEssy. *Cf., e.g.*, *Davis*, 396 F.3d at 882-83 (granting summary judgment for defendants in contract fraud claim because plaintiffs failed to read document that they were given ample opportunity to read). Because plaintiff relies on this misrepresentation to attempt to recover the full total of his investments with both Bloom and Uber, this question renders damages uncertain.

The same uncertainty exists for McEssy's Count VII claim of a breach of fiduciary duties, because that claim also relies in part on the concealment of Gray's disciplinary history. A reasonable juror could conclude that because plaintiff had already invested in Bloom and Twitter months before the American defendant lied to him about the severity of his disciplinary history, and therefore even if he had fired the American defendant upon being told the truth, he already would have suffered at least some loss from these investments. *Compare* Dkt. 242-16, p. 2 (demonstrating plaintiff's purchase of $200,000 in Bloom stock on

November 19, 2012); Hall Dep. 26 (stating that plaintiff invested in Twitter in March of 2013), *with* Hall Dep. 33 (describing Hall's discovery of the American defendant's disciplinary history after April of 2013). These questions of fact can only be resolved through trial.

## V.  **CONCLUSION**

McEssy today sees his rights vindicated. Definitively, Gray defrauded him by his conduct in the Uber transaction—as he openly admits—and he must answer for the personal wrongs he committed against plaintiff just as he has already had to answer for his crimes. Similarly, Archipel and BIM, as the vehicles for this fraud, now stand answerable to plaintiff. Given that some of the claims against both of these defendants remain unresolved, however, this Court defers judgment on damages against these defendants pending the complete resolution of this dispute.

Conversely, McEssy's showing of Bennington's liability was critically lacking. As such, this remote Canadian corporation cannot be held liable for plaintiff's injuries. Plaintiff's claims against Bennington must thus be dismissed with prejudice.

A closer question, and one that cannot be answered without trial, is whether Edwards should also stand liable. Both sides believed that they had established that there was no question of fact as to the Canadian defendant's liability to McEssy. As is often the case with such disputes, the truth is in the middle. Plaintiff's allegations are serious and supported well enough to merit inspection. The Canadian defendant has marshalled his own evidentiary support, and he should not be wrongfully held liable for the actions of others. Both sides are true, and thus it is not for this Court to decide as a matter of law which argument is the stronger. Plaintiff and the Canadian defendant may proceed to trial to answer that question.

Therefore, it is

ORDERED that

1.     Plaintiff's motion for partial summary judgment against defendant Gray is GRANTED as to liability under Counts I; V; and VII of the Second Amended Complaint;

1.A.     Plaintiff is ordered to show cause why Counts:  II; III; IV; VI; VIII; IX; X; XI; XII; XIII; XIV; and XV of the Second Amended Complaint against defendant Gray should not be dismissed under Rule 41(b) for failure to prosecute on or before 12:00 p.m. on Monday, December 30, 2019;

1.B.     The parties shall proceed to trial as to plaintiff's damages owed by defendant Gray for Counts I, V, and VII of the Second Amended Complaint;

2.     Plaintiff's motion for summary judgment against defendants Edwards and Bennington is DENIED;

3.     Defendant Edwards' motion for summary judgment against plaintiff is GRANTED in part and DENIED in part;

3.A.     Plaintiff's Count VII claim for breach of fiduciary duty is DISMISSED WITH PREJUDICE as against defendant Edwards;

3.B.     Because Counts  II, III, IV, VI, VIII, IX, X, XI, XII, XIII, XIV, and XV of the Second Amended Complaint were dismissed against defendant Edwards by this Court's August 11, 2016 decision, Counts I and V of the Second Amended Complaint are all that remain against defendant Edwards;

3.C.     The parties shall proceed to trial as to defendant Edwards' liability to plaintiff and, if liability is found, damages for Counts I and V of the Second Amended Complaint;

4.     Defendant Bennington's motion for summary judgment against plaintiff is GRANTED;

4.A.　All of plaintiff's claims against defendant Bennington are DISMISSED WITH PREJUDICE;

5.　Plaintiff's motion for partial default judgment against defendant BIM is GRANTED;

5.A.　Plaintiff is ordered to show cause why Counts: II; III; IV; VI; VIII; IX; X; XI; XII; XIII; XIV; and XV of the Second Amended Complaint against defendant BIM should not be dismissed under Rule 41(b) for failure to prosecute on or before 12:00 p.m. on Monday, December 30, 2019;

5.B.　Judgment on damages as to defendant BIM is deferred until plaintiff's remaining claims are resolved;

6.　Plaintiff's motion for partial default judgment against defendant Archipel is GRANTED for his claims under Counts: (I) § 10(b) securities fraud; and (V) common law fraud;

6.A.　Plaintiff's motion for partial default judgment against defendant Archipel as to Count VII for breach of a fiduciary duty is DENIED;

6.B.　Plaintiff is ordered to show cause why Count VII of the Second Amended Complaint against defendant Archipel for breach of fiduciary duty should not be dismissed under Rule 56(f)(1) in light of the insufficiency of the complaint on or before 12:00 p.m. on Monday, December 30, 2019;

6.C.　Plaintiff is ordered to show cause why Counts: II; III; IV; VI; VIII; IX; X; XI; XII; XIII; XIV; and XV of the Second Amended Complaint against defendant Archipel should not be dismissed under Rule 41(b) for failure to prosecute on or before 12:00 p.m. on Monday, December 30, 2019; and

7.      Judgment on damages as to defendant Archipel is deferred until plaintiff's remaining claims are resolved;

It is SO ORDERED.

_____
David N. Hurd
U.S. District Judge

Dated:  December 13, 2019
        Utica, New York.